# EXHIBIT B

1

CARNEY BATES & PULLIAM, PLLC
Hank Bates (SBN 167688)
hbates@cbplaw.com
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile:  (501) 312-8505

**Electronically FILED by**
**Superior Court of California,**
**County of Los Angeles**
**4/01/2025 12:00 AM**
**David W. Slayton,**
**Executive Officer/Clerk of Court,**
**By G. Cordon, Deputy Clerk**

2

3

4

5

*Attorneys for Plaintiffs Michael Russell,*
*Joseph Preston, and the Proposed Classes*

6

7

### IN THE SUPERIOR COURT FOR THE STATE OF CALIFORNIA

8

### IN AND FOR THE COUNTY OF LOS ANGELES

9

MICHAEL RUSSELL and JOSEPH
PRESTON, individually, on behalf of all others
similarly situated, and on behalf of the general
public,

Plaintiffs,

v.

DAVE, INC., a Delaware corporation, and
EVOLVE BANK & TRUST,

Defendants.

10

11

12

13

14

15

16

Case No.:  25STCV09358

<u>CLASS ACTION</u>

**COMPLAINT FOR DAMAGES AND**
**EQUITABLE RELIEF FOR**
**VIOLATIONS OF:**
  **(1) THE MILITARY LENDING**
     **ACT, 10 U.S.C. § 987, *et seq.*; and**
  **(2) THE TRUTH IN LENDING ACT,**
     **15 U.S.C. § 1601, *et seq.***

**Unlimited Civil Case**

<u>**JURY TRIAL DEMANDED**</u>

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs, Michael Russell, a Specialist in the U.S. Army ("Spc. Russell"), and Joseph Preston, a Private First Class in the U.S. Army ("PFC Preston") (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, and on behalf of the general public, allege the following based upon personal knowledge as to themselves and upon information and belief and the investigation of counsel as to all other matters, and bring this Class Action Complaint against Dave, Inc. ("Dave"), its bank partner, Evolve Bank & Trust ("Evolve") (collectively, "Defendants") and DOES 1 through 10, inclusive, and allege as follows:

## **NATURE OF THIS ACTION**

1.     This Complaint seeks to protect active-duty military service members from Dave's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA") and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"). The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Members") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, Dave makes no effort to fulfill its duty to determine whether it is lending to Covered Members or to provide legally mandated protections for them.

2.     Dave—and its banking "partner," Evolve—are in the business of payday lending through an earned wage access ("EWA") product. Acting together, Defendants make funds available to customers, who repay principal and finance charges (including expedited transfer fees, subscription charges, so-called "tips" for most of the class period, and, of late, "overdraft fees") on payday.

3.     Dave's business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Indeed, Dave markets to consumers it considers "financially vulnerable" or "financially coping," including those whose spending exceeds their income, who have minimal savings, and who overdraft their bank accounts frequently.

4.     Despite advertising its loans as "no interest" and promising no mandatory fees, in practice, Dave regularly takes in **triple- and quadruple-digit** finance charges on loans it issues. These APRs can reach absurd heights, making loans to Plaintiffs approaching **1,300% MAPR**. The

end result is a financial product that extracts exorbitant fees from workers, encourages serial usage and dependence on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

5.    Plaintiffs are both users of Dave's cash advance product, "ExtraCash." By virtue of the sky-high fees charged to borrow against their future salary, Dave and its partner, Evolve, have extended consumer credit to Plaintiffs on numerous occasions in violation of the MLA and TILA.

6.    Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products can trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Dave's ExtraCash loan transactions are extensions of consumer credit.

7.    In violation of the MLA, Defendants uses the Dave ExtraCash advance product to saddle Covered Members with charges that, on average, yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

8.    Dave's consumer credit agreements violate the MLA in at least four ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any credit disclosures required by the MLA; (3) including a purported class action ban and waiver of jury trial; and (4) including a mandatory binding arbitration clause. 10 U.S.C. §§ 987(b), (c) & (e)(1)(2)(5)(6).

9.    Dave and its partner, Evolve, systematically violate the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

10.    Among the abusive lending practices that the MLA was designed to curb was predatory payday loans made to servicemembers.[1] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[2] The Report noted that payday lenders

---

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[2] *Id.* at 10–16.

were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

11.    Defendants' business practices violate the MLA and TILA and are part of a systematic nationwide policy and practice. Plaintiffs seek to hold Defendants accountable for their actions and prevent their predatory lending practices from continuing.

## PARTIES

12.    Plaintiff, Spc. Russell, is an individual, over 18 years of age. At all times relevant, Spc. Russell was a natural person and resident of Tacoma, Washington. He has been a member of the U.S. Army since August 2021. During the class period, Spc. Russell was a Covered Member and an active-duty service member employed by the U.S. Army.

13.    Plaintiff, PFC Preston, is an individual, over 18 years of age. At all relevant times, PFC Preston was a natural person and resident of Locust Grove, Georgia. He has been a member of the U.S. Army since July 2023. During the class period, PFC Preston was a Covered Member and an active-duty service member employed by the U.S. Army.

14.    Defendant Dave, Inc., is a Delaware corporation with its principal place of business at 1265 S. Cochran Ave., Los Angeles, California. Dave has offered loan agreements to consumers, including Covered Members, since at least 2017, entering into millions of credit transactions.

15.    Defendant Evolve Bank & Trust is a bank organized under the laws of Arkansas with locations in California. Evolve's corporate headquarters and principal place of business is located at 6000 Poplar Avenue, Suite 300, Memphis, Tennessee 38119. Evolve acts as Dave's "bank partner" and purportedly facilitates the ExtraCash product.

16.    Defendants DOES 1 through 10 are persons or entities whose true names and capacities are presently unknown to Plaintiffs and who therefore are sued by such fictitious names.

---

[3] *Id.* at 10–11.
[4] *Id.* at 11.

Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants perpetrated some or all of the wrongful acts alleged herein, are responsible in some manner for the matters alleged herein, and are jointly and severally liable to Plaintiffs. Plaintiffs will seek leave of court to amend this complaint to state the true names and capacities of such fictitiously named Defendants when ascertained.

## TOLLING OF THE STATUTE OF LIMITATIONS

17.    The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, *et seq.*, tolls any and all limitation or repose periods for all active-duty military members, including those similarly situated to Plaintiffs, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## JURISDICTION AND VENUE

18.    Venue is proper in the County of Los Angeles because Defendant Dave is headquartered in Los Angeles County, coordinated business operations in California, did business in California and in Los Angeles County, and committed the wrongful acts alleged herein in Los Angeles County. Venue is further proper in this Court because a substantial portion of the conduct complained of occurred in Los Angeles County.

19.    This Court has jurisdiction over Dave, because it, at all times relevant herein, was qualified to do business and regularly conducted business in California.

20.    This Court has jurisdiction over Evolve, because it, at all times relevant herein, was qualified to do business and regularly conducted business in California.

21.    Furthermore, the terms of service provided on Dave's website provide for jurisdiction and venue of suits relating to Defendants' services in "the federal or state courts of Los Angeles County, California."

EXHIBIT B
Page 10

1

## LEGAL BACKGROUND

2

## The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered

3

## Members

4      22.    The DoD's Report on lending practices discussed the payday lending industry at

5    length.[5] The Report noted that payday lenders were "heavily concentrated around military bases,"

6    with statistics showing that communities with military installations "rank among the most heavily

7    targeted communities in their respective states."[6]

8      23.    Military populations are targeted for an obvious reason: "active-duty military

9    personnel are three times more likely than civilians to have taken out a payday loan," with such

10   loans costing servicemembers millions in abusive fees.[7] Moreover, the military payment

11   architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make

12   them particularly vulnerable to predatory payday loans:

13      Check-holding, a central feature of payday loans, is particularly risky for military
       borrowers. Every payday loan involves a prospective "bad" check. Military
14      borrowers are required to maintain bank accounts in order to receive direct deposit
       of military pay and are subject to the Uniform Code of Military Justice that
15      penalizes deliberately writing a check not covered by funds on deposit. Borrowers
       become trapped in repeat borrowing or renewals of loans in order to keep the
16      check used to obtain the loan from bouncing, a key reason that payday loans are
17      debt traps.[8]

18      24.    While the precise EWA product offering was developed somewhat recently, its

19   genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted

20   military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and

21   'military loans' via the Internet."[9] Those loans, like Dave's, "are delivered and collected online

22   through electronic fund transfer."[10]

23

24

25   [5] Report, *supra* n.1.
     [6] *Id.* at 10–11.
26   [7] *Id.* at 11.
     [8] *Id.* at 14. To be sure, EWA providers like Dave do not collect physical checks from their customers at
27   loan initiation, but instead takes a virtual check by requiring Covered Members to authorize automatic
     debits from bank accounts to repay their loans.
28   [9] *Id.* at 15.
     [10] *Id.* at 16.

CLASS ACTION COMPLAINT AND JURY DEMAND

25. The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate Dave's business model:

(1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit, or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[11]

(3) . . . Increasingly the Internet is used to promote loans to Service members.

(4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

. . .

(6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[12]

26. The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a

---

[11] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.
[12] *Id.* at 21–22.

6

CLASS ACTION COMPLAINT AND JURY DEMAND

tarnished career."[13] As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[14]

27.    Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[15]

28.    To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[16]

29.    The American Bar Association and others expressed support for the DoD's request, noting the urgent need for remedial Congressional action to curb predatory loan practices harming Service members. The legislation requested was supported by the DoD, military and veterans organizations, legal aid organizations, consumer advocacy groups, faith-based organizations, and of course lawmakers.

30.    Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

## **The Military Lending Act**

31.    In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

---

[13] *Id.* at 39.
[14] *Id.* at 41–42.
[15] *Id.* at 46.
[16] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

7

32.     The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

33.     The MLA also requires mandatory disclosures in "consumer credit"[17] transactions with Covered Members, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

34.     Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that require the Covered Borrow to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

35.     The MLA also makes it unlawful to charge a Covered Member any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

### **The Truth in Lending Act**

36.     The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

---

[17] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

CLASS ACTION COMPLAINT AND JURY DEMAND

37.    Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those Dave offers here. Dave fails to make any of the following required disclosures:

- "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

- "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *Id.* at § 1638(2)(B);

- "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

- "The finance charge expressed as an 'annual percentage rate', using that term," *Id.* at § 1638(4);

- "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *Id.* at § 1638(6);

- "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *Id.* at § 1638(8);

- "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *Id.* at § 1638(9);

- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *Id.* at § 1638(11); and

- "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *Id.* at § 1638(12).

CLASS ACTION COMPLAINT AND JURY DEMAND

**FACTS**

**The Earned Wage Product Market and Dave**

**EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health**

38.     A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

39.     Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—has been created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

40.     EWA products provide workers, before their payday, with a portion of their earned but unpaid wages or to funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

41.     Defendant Dave is one such fintech company that (in partnership with Evolve) provides an EWA service, which it calls "ExtraCash." The ExtraCash service is a cash advance whereby Dave loans customers funds that are repaid on their next payday. Dave describes ExtraCash as a product intended to allow borrowers to tap into a "cash reserve" (*i.e.*, money on demand) for personal use paying bills and expenses.

42.     ExtraCash loans are "repayable on demand."

43.     To access ExtraCash loans, users must first link their bank account to their Dave profile and authorize Dave to collect repayment through automated debits from their connected debit card on the scheduled repayment date.

44.     EWA providers advertise their products as "free" or "no interest" while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loan-shark rates.

45.     For most of the class period, Dave was paid through three types of fees: (1) expedite

CLASS ACTION COMPLAINT AND JURY DEMAND

1    fees, (2) mandatory subscription fees, and (3) tips.

2        46.    Recently, after being sued by the Department of Justice, Dave ceased charging tips,

3    changed the structure of its expedite fees, and began charging a fourth type of fee: (4) a "simplified"

4    overdraft service fee on all transactions. Each of these fees is discussed below.

5        47.    First, **expedite fees** (alternatively known as "Express Fees" or "instant transfer

6    fees") are charged to provide instant access to loan funds. For ExtraCash loans, until early 2025,

7    Defendants charged between $3.00 and $25.00, depending on the size of the advance taken and

8    whether the ExtraCash loan was disbursed to an external account or a bank account maintained by

9    Dave.

10        48.    The actual cost to provide customers with instant access to funds is less than $0.05.[18]

11        49.    In February 2025, Dave completed a change in fee architecture that resulted in a

12    reduction in the amounts it charges for instant transfer fees. Since February 2025, users must pay a

13    1.5% Express Fee to obtain instant access to their funds to their external bank account.

14        50.    Dave achieved this fee reduction in large part by shifting revenues previously

15    received through Express Fees to its newly-minted mandatory overdraft service fee, discussed *infra*.

16        51.    Dave's website, app, and marketing include numerous representations about the

17    speed of access to funds, emphasizing customers can receive cash "instantly," "on the spot," "now,"

18    and "in under 5 minutes," telling consumers that "[a]ll you have to do is download this app," and

19    that they will pay "no interest" and "no hidden fees."

20        52.    Despite its prominent advertisements of instant access to funds without hidden fees,

21    borrowers must pay an additional fee that is not meaningfully disclosed until after they provide

22    Dave access to their bank accounts and try to take out a cash advance.

23        53.    Dave's only references to Express Fees in its advertising or at the app stores typically

24    appear in small print, are buried in block text, use vague or confusing language, and/or are found

25    in obscure locations, and do not state that unless consumers pay an Express Fee, Dave will require

26

27

28    ---

[18] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

1    them to wait two to three business days before receiving their advance.

2    54.    The speed of access to funds is an essential and defining aspect of EWA products.

3    They are designed to address—and marketed as addressing—what is generally a less-than two-

4    week liquidity problem.

5    55.    While expedite fees are notionally optional and users can use an EWA product

6    without paying one, they are difficult to access and negate their usefulness to consumers. For

7    instance, the free, non-expedited version of an advance usually take 2–3 banking days for users to

8    receive, while the expedited service takes just a few minutes. This delay is problematic for Dave's

9    intended users, consumers living paycheck to paycheck who turn to EWA providers for the precise

10    reason that their need for cash is urgent and cannot wait.

11    56.    Indeed, a recent study found that the average loan term for loans provided by Dave

12    was only 10.5 days.[19] Consumers who cannot wait ten days to access their wages certainly will pay

13    whatever fees an EWA provider charges to obtain their funds as quickly as possible. As a result,

14    the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement.[20]

15    57.    Turning to the second type of fee, **subscription charges** are monthly fees Dave

16    charges its users to be eligible to apply for Dave ExtraCash loans.

17    58.    Dave forces users signing up to its service through its app to agree to a $1.00

18    
19    monthly subscription to gain access to the ExtraCash loan product.

20    59.    Dave does not allow users to obtain a loan without first enrolling in the automatically

21    recurring charge. Dave continues to charge a consumer this unavoidable fee each month until the

22    consumer takes affirmative action to cancel it.

23    

24    [19] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar*
25    *Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr. 2024)
     (hereinafter "*Not Free*").
26    [20] One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster. *Not*
     *Free*, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by consumers
27    using employer-integrated EWA providers were for expedite fees. Consumer Financial Protection Bureau,
     Data Spotlight: Developments in the Paycheck Advance Market (July 18, 2024),
28    https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-
     paycheck-advance-market/.

60.    There is no mechanism available through Dave's app to sign up for ExtraCash loans without first agreeing to monthly subscription charges.

61.    Dave's subscription practices have received significant criticism—from both inside and outside Dave—and are the subject of an enforcement action initially brought by the Federal Trade Commission ("FTC") and subsequently referred to the Department of Justice.[21]

62.    And paying Dave's subscription fees does not guarantee a user will be able to receive an ExtraCash advance. Based upon an investigation of Dave, the DOJ alleges "[m]ore than three-quarters of the time, Dave did not offer first-time customers any advance at all."[22] For new users who Dave qualifies to receive a loan, "about 0.009% of those offers—or less than 1 in 10,000—were for $500 and only 0.56%, or about 1 in 175, were for at least $250."[23]

63.    When Dave did offer an advance, the most common offer was for $25. Even for existing customers who receive and timely repay their loaned funds, Dave offered $250 or more to a minuscule number (less than 1%) of consumers.

64.    Turning to the third type of fee (charged by Dave until February 2025), "**tips**" are simply additional funds the lender prompts the user to pay.

65.    These purported "tips" serve no purpose whatsoever to Dave customers and instead go directly to Dave's bottom line.

66.    EWA providers like Dave deploy techniques borrowed from behavioral economics to pressure users into tipping each time they obtain an EWA loan. For example, the California Department of Financial Protection and Innovation ("DFPI") listed "multiple strategies that lenders use to make tips almost as certain as required fees," including "[s]etting default tips and using other

---

[21] *United States v. Dave, Inc.*, No. 2:24-cv-09566-MRG-AGR, Am. Compl., ECF No. 44 (C.D. Cal. Dec. 30, 2024) (hereafter "DOJ Compl.").
[22] *Id.* ¶ 35.
[23] *Id.*

CLASS ACTION COMPLAINT AND JURY DEMAND

user interface elements to mak[e] tipping hard to avoid; [m]aking it difficult to set a $0 tip or not advertising that a particular payment is optional; and [c]laiming that tips are used to help other vulnerable consumers or for charitable contributions."[24]

67.    Dave's app architecture deployed a number of these dark patterns to deceive its customers into paying as many expensive tips as possible in connection with its loan products.

68.    Here's how it worked: After applying for a loan from Dave, Dave presented consumers with a screen that it uses to charge them a "tip." Dave did not make clear to consumers that they were agreeing to an additional charge or that the tip is "optional." An example of this screen is below, headed "Your advance is on its way!":



[24] *2021 Earned Wage Access Findings*, CAL. DEP'T FIN. PROTEC. & INNOVATION, at 61–62 (March 2023), https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf (hereinafter "DFPI Findings")

CLASS ACTION COMPLAINT AND JURY DEMAND

69.    A large green button labeled "Thank you!" appears at the bottom of the screen. Users who simply tap the "Thank you!" button are charged an extra 15% of their advance. Dave calls this charge a "tip."

70.    As Dave is well aware, many borrowers tap the "Thank you!" button without knowing that Dave is charging an extra 15% of their advance. At all relevant times, Dave failed to mention the charge in its advertising, and consumers who open the Dave app for the first time and proceed directly to attempt to take an advance do not encounter any mention of this charge, or how to avoid being subject to it, before granting Dave access to their bank accounts.

71.    Because of the way in which they are presented, many consumers did not realize they were paying the extra purported "tip" charges, while others believed this extra charge to be an unavoidable part of Dave's advance process.

72.    Internal Dave documents show Dave has been aware it charges consumers for "tips" without their knowledge and that the Dave app's interface leads consumers to believe tipping charges are unavoidable. For instance, an internal analysis of customer service data reflects that "[m]embers are still unaware they left a tip when they advance" and that consumers are "upset" about these charges. The analysis notes that consumers are "having a hard time" avoiding being charged Dave's preset "tip" of 15% and recommended that Dave "provide better visibility" about how to avoid the charge. Dave did not implement the recommendation to make clear to consumers how to avoid the charge.

73.    An internal Dave study found that "Didn't want to pay tip" was among the top sources of user complaints. Another internal Dave document listed "[n]o clear option to not tip" as a "Pain-Point[]" for consumers. The document also recommended, as the top of a list of "Future Initiatives," adding a "[n]o tip button." Dave did not add this button.

CLASS ACTION COMPLAINT AND JURY DEMAND

74.    In addition to deceiving consumers about whether they are being charged, and if tips are required, Dave misleadingly represented that, based on the payment of a specified tip level, Dave would pay for or donate a specified number of "healthy meals" to children in need.

75.    The tip screen screenshot above (*supra* ¶ 68) includes representations that tips "provide a meal for every % you tip" – so, instead of asking consumers to tip 10%, 15%, or 20%, the app purports to have consumers choose whether to tip "10 Healthy Meals," "15 Healthy Meals," or "20 Healthy Meals." The tip screen includes images of a child with a spoon surrounded by nine food items.

76.    During the relevant period, the default tip was 15% of the loan. When a consumer taps on "20 Healthy Meals," the number of food items around the child increases to twelve. If the consumer taps on "10 Healthy Meals," the number of food items around the child drops.

77.    To avoid paying a "tip," users had to figure out to first tap the "Leave a custom tip" button, which is about half as long as the "Thank you!" button and—unlike the "Thank you!" button, which is colored green against a white background—is colored white against a white background. If consumers tap this button, the three labeled boxes are replaced with a horizontal "slider."

78.    Initially, above the slider in large, bold-print text appear with the words "15 Healthy Meals" and another image of the cartoon child holding a spoon and surrounded by ten food items.

79.    If the user moves the slider to the right, the number of "Healthy Meals" displayed increases incrementally up to 25. As the count of "Healthy Meals" increases, more food items appear around the cartoon child, with twenty-five items filling the screen when the count of "Healthy Meals" reaches 25:



80.    If the user moves the slider left, the number of "Healthy Meals" displayed decreases incrementally down to 0. As the slider moves to the left and the count of "Healthy Meals" decreases, food items disappear from around the child. If the count of "Healthy Meals" reaches 2, the only items around the child are bread and water.

81.    To avoid paying any tip, the consumer must move the slider fully to the left to reduce the count of "Healthy Meals" to zero. The slider then turns from green to red, the text of the large green button at the bottom of the screen changes from "Thank you!" to "No tip," and the image of the child is replaced by an image of an empty plate with a fork and spoon:

CLASS ACTION COMPLAINT AND JURY DEMAND



82.    The combination of the imagery and the bold-print language about the number of "Healthy Meals" tied to tips lead consumers to believe that, if the consumer permits Dave to charge a large "tip," Defendants will donate that money to charity or pay for or donate a specified number of meals to children in need, based on the size of the "tip."

83.    In reality, Dave does not pay for or donate a specified number of meals to children in need based on its user "tips." Instead, for each percentage point of a "tip" charged, Dave donates only ten cents and keeps the rest. For example, if a consumer were to tap the "Thank you!" button and donate on the "15 Healthy Meals" option, Dave would not pay for or donate "15 Healthy Meals," but would instead donate only $1.50 to a hunger relief organization: far less than it would cost to buy 15 meals or to purchase and prepare the food for 15 meals.

84.    Dave employees have internally described Dave's interface—and the ways in which they collect tips—as a "dark pattern" that had been criticized by "designers and members."

85.    Dave internal documents acknowledge this "Healthy Meals" screen content is misleading. Multiple Dave executives described the "Healthy Meals" content of these screens as involving a "dark / guilt inducing design pattern" that helps drive revenue. Others recognized the "hungry child def[initely] leaves us open for criticism" and exhibits "very questionable design decisions."

86.    These tips proved too profitable to abandon—until, that is, they were sued by the FTC and DOJ for their tipping conduct and created a new fee to replace tip-derived revenue (*see infra*). Dave reported receiving more than $67,000,000 in tips in 2024 alone, approximately 19% of the company's revenue for that year.[25]

87.    The weaponization of dark patterns and strategies from behavioral economics— used by Dave and other EWA providers—turned tips into a huge revenue source. A recent data summary found that EWA providers that request tips receive them in 73% of transactions, on average $4.09 in tips per transaction.[26]

88.    Turning to the fourth type of fee, **overdraft service fees** are mandatory fees applied for users to access an ExtraCash advance.

89.    Dave recently explained the transition to overdraft service fees: "The optional fee model, which allowed members to access credit for as little as $0 per transaction, has been replaced with a simplified 5% fee structure including a $5 minimum and $15 cap." Dave's 10-K characterizes the 5% fee as a "simplified 5% overdraft service fee."

90.    When users request an ExtraCash advance loan through the Dave app, the overdraft service fee is applied automatically and there is no mechanism for obtaining ExtraCash funds without paying this fee.

---

[25] *Dave Inc. 2024 Form 10-K*, at p. 50, available at https://investors.dave.com/static-files/7739429a-9152-4e3a-b76e-00a7a2893dc2 (last visited Mar. 30, 2025).
[26] DFPI Findings, *supra* note 24, at 62.

EXHIBIT B
Page 25

91.     When properly viewing EWA providers' expedite fees, subscription fees, tips, and other service fees as costs of credit (*i.e.* finance charges), the annual percentage rates (APR) for these loans are eye-popping.

92.     A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:



93.     The APR received by Dave for its Cash Advance product is similar and can be ***much higher***. An analysis of thousands of Dave loan transactions found the average APR paid for Dave ExtraCash loans to be 329%.[27] As discussed *infra*, Dave made loans to Plaintiffs with APRs orders of magnitude above the MLA limit, with one such loan costing ***1,288% interest***. *See infra*.

94.     Ironically, Dave and other industry participants market their products as a low-cost alternative to payday loans.[28] In truth, Dave is a wolf in sheep's clothing: extending loans with APRs nearly identical to the exorbitantly-priced payday loan products it claims to replace.

---

[27] *Not Free*, *supra* note 19, at 10.
[28] *Dave Inc. 2024 Form 10-K*, at p. 18 (noting Dave "compete[s] against companies and financial institutions . . . serving credit-challenged consumers, including . . . payday lenders").

CLASS ACTION COMPLAINT AND JURY DEMAND

95.     On top of charging loan-shark interest rates, Dave and others limit the amount a borrower can access per day, while simultaneously allowing multiple advances per pay period, thereby fostering repeat withdrawals and concomitant repeated payment of expedite fees and tips.

96.     Dave, specifically, allows qualifying users to take up to two advances per pay period—an initial advance, and a second "Advance Recharge" which may be available within one day of an initial advance. Financially insecure borrowers often take out these serial loans, in part because Dave's conservative limits on the amount of funds users can obtain in any given ExtraCash advance through strict underwriting practices.

97.     This architecture maximizes fees for EWA providers like Dave, while creating a debt trap for vulnerable consumers. "By imposing limitations on how much can be borrowed in a single advance, while allowing more than one advance per pay period, lenders force borrowers to take out multiple advances—and pay multiple fees—to access more money. The business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee or leaving a tip difficult to avoid."[29]

98.     The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

99.     A Center for Responsible Lending ("CRL") analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment, and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by

---

[29] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").

reborrowing within two weeks.[30] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

100.    Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[31]

**EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect**

101.    While EWA products are financially disastrous for customers, EWA products have proven profitable for the companies offering them. They maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

102.    As discussed above, "Not all members [who sign up for a Dave account and pay subscription fees] qualify for ExtraCash and few qualify for $500."

103.    To be eligible for an ExtraCash advance, borrowers must meet minimum qualifications set by Dave.

104.    ExtraCash loans are available only to U.S. citizens or lawful permanent residents who are "at least 18 years of age, have a U.S. physical address or military addresses[,] and have a Social Security Number or Tax Identification Number." According to Dave's terms, ExtraCash advances are "only available to individuals for personal, family or household purposes" and may not be used by a business or for a business purpose.

105.    In addition, to obtain an ExtraCash loan, users must provide demographic information about themselves (including *inter alia* name, date of birth, email, phone number, and

---

[30] *Loan Shark*, *supra* note 29, at 7.
[31] *Not Free*, *supra* note 19, at 6.

social security number) to Dave, connect a bank account to the Dave app, sign up to pay monthly subscription fees, and pre-authorize Dave to assess fees and collect repayment of borrowed funds.

106.    Moreover, a borrower can only qualify if their connected bank account has a positive balance and includes three or more recurring deposits, totaling $1,000 or more.

107.    To determine whether a borrower is creditworthy, and decide how much credit to extend in the first place, Dave requires users to connect their accounts to the Dave app through a third-party service called Plaid.[32] Plaid partners with Dave and other fintech companies to allow them to view data in customers' accounts. Plaid allows Dave to "[q]uickly verify assets and income" of Dave users, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[33]

108.    Dave uses its real-time insight into customer accounts to ensure borrowers will have sufficient funds to repay their loans on payday and schedule debits for the payday immediately following any given loan, ensuring their loans are paid as soon as funds become available. The settlement (or repayment) date is automatically scheduled "to be around your next payday, or the nearest Friday, to make sure you have funds available."

109.    Dave's underwriting process is detailed and considers many factors. Dave continually adjusts maximum withdrawal amounts depending on the individual's borrowing history and financial health (as gleaned through Plaid). In determining how much credit to extend, Dave considers "a wide variety of data points," including:

- Bank account balance history
- Spending patterns

---

[32] Users signing up for a Dave account through the app are shown a screen directing the user to connect their bank account to Dave and are unable to access ExtraCash advances unless they connect their bank account through Plaid.

[33] *Plaid Solutions: Credit*, Plaid.com, https://plaid.com/solutions/credit/ (last visited Mar. 23, 2025).

- Income history

- Other risk-based factors.[34]

110.     Dave also considers borrowers' "prior history with [Dave] and the activity in your connected account. Settling your prior ExtraCash transfers on time and in full, maintaining a positive and having recurring deposits in your linked bank account can be positive factors."[35]

111.     According to Dave's 2024 Annual Report, once a borrower member "connects his or her bank account to the Dave app, data regarding the Member's account is gathered and analyzed. The amount of the advance available to a Member is a function of a proprietary machine-learning-based algorithm that analyzes historical spending, savings and earnings patterns based on data gathered from the Member's bank account, among other data points."[36]

112.     Dave further notes that its ability to consistently collect on money loaned to borrowers is essential to its business model: "The performance of ExtraCash is significantly dependent on our ability to develop and deploy effective models, with oversight by our bank partner, to evaluate an applicant's credit profile and likelihood of default based on a variety of factors and originate ExtraCash overdrafts."[37]

113.     Dave's underwriting process is both rigorous and continual. Dave advises it updates user eligibility "daily" and encourages users to "check back tomorrow to see if it increased."[38]

114.     And qualifying for a cash advance is by no means guaranteed. Again, "Not all members qualify for ExtraCash." According to an investigation by the Federal Trade Commission, more than 75% of the time, Dave does not offer users an ExtraCash loan at all and, on average,

---

[34] *ExtraCash FAQs: What affects my eligibility for an advance?*, DAVE APP (last visited Mar. 30, 2025).
[35] *ExtraCash^{TM} eligibility*, https://support.dave.com/hc/en-us/articles/34766110141709-ExtraCash-eligibility (last visited Mar. 30, 2025).
[36] *Dave Inc. 2024 Annual Report*, at 8.
[37] *Id.* at 20.
[38] *ExtraCash^{TM} eligibility*, https://support.dave.com/hc/en-us/articles/34766110141709-ExtraCash-eligibility (last visited Mar. 30, 2025).

24

CLASS ACTION COMPLAINT AND JURY DEMAND

40% of users are not able to obtain a single offer for a cash advance from Dave in a calendar month.[39]

115.    That is, after reviewing borrowers' financials, Dave determines many of its customers (who pay monthly subscription fees to potentially obtain cash advances) are not creditworthy and declines to offer them ExtraCash loan access.

116.    For borrowers who qualify, Dave strictly monitors their financial health to determine whether they are eligible and, if so, how much credit to extend based on borrowers' default risk and ability to repay.[40] Through its constant underwriting process, Dave extends loans to borrowers only when it is confident they will repay.

117.    For qualifying borrowers, Dave generally begins by offering relatively low amounts of credit: The most common loan offer is $25.

118.    Borrowers obtain greater access to credit—*i.e.*, Dave raises their maximum loan limit—by consistently paying off loans to Dave on time and generally improving their financial health (which Dave monitors through the borrowers' bank balance, spending behavior, repayment history, and income).

119.    Dave notably restricts access to its largest loans to a select few of its borrowers. For new users, only about 1 in 10,000 (or 0.009%) of users are offered a $500 loan amount. And more than 99% of loan offers were for less than $250.

120.    These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional

---

[39] DOJ Compl., ¶ 35.
[40] *ExtraCash^{TM} eligibility*, https://support.dave.com/hc/en-us/articles/34766110141709-ExtraCash-eligibility (last visited Mar. 30, 2025) ("The ExtraCash you are eligible for updates daily and each day, the limit may change."); *Dave Inc. 2024 Form 10-K*, at 20 (noting the financial performance of Dave's ExtraCash product "is significantly dependent" on Dave's ability to "evaluate an applicant's credit profile and likelihood of default").

credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[41] The only distinction—that traditional lenders review credit scores and reports and borrowers' applications to determine creditworthiness while EWA providers like Dave directly review borrowers' financial accounts—is one without a difference.

121.     Dave's requirement that users link a checking account (that receives a consistent source of directly deposited income) to their Dave profile and provide a debit card enables a fulsome underwriting process (see *supra*) and ensures seamless repayment (see *infra*).

122.     Users who sign up for ExtraCash loans from Dave must authorize Dave to automatically withdraw, from their connected bank account or debit card, outstanding ExtraCash advances, including any Express Fees, overdraft service fees, and (for most of the relevant period) tips. Dave automatically schedules repayment to be made set to be around the borrower's next payday, or the nearest Friday, to ensure funds are available.

123.     When a connected account has insufficient funds to cover repayment, Dave is authorized to charge the user's connected debit card associated with their account. Borrowers must further agree that if that payment method fails, Dave may process the repayment through an ACH transfer. If both of those methods fail, Dave is authorized to attempt to recoup funds from other affiliated settlement accounts or "Dave Checking Account/Dave Spending Account." If all of those methods fail, Dave is authorized to make additional collection attempts on the next date it detects

---

[41] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

CLASS ACTION COMPLAINT AND JURY DEMAND

(from its constantly-updated Plaid data) sufficient funds in any of the borrower's accounts to repay the debt.

124.    In sum, Dave's underwriting process requires, before any money changes hands, that borrowers: (1) provide detailed demographic information, including addresses and social security numbers, to Dave, (2) demonstrate they receive regular, consistent income, (3) in an amount sufficient to cover existing obligations *and* an ExtraCash Advance; (4) link the bank account to which direct deposits are received to Dave's app through Plaid; (5) authorize Dave to automatically debit the linked accounts on the borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees; and (6) be current on all prior ExtraCash advance loans. Borrowers who fail to complete these steps cannot obtain cash advances.

125.    If a customer is unable to repay a loan, Dave prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid. In addition, Dave prohibits users from canceling their automated monthly subscription fees until all ExtraCash loans are repaid.

126.    Moreover, Dave discloses in its annual report that it "may use professional external debt collection agents to collect delinquent ExtraCash advances."[42]

127.    Through these underwriting procedures and policies, Dave ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's next payday is deposited.

---

[42] *Dave, Inc. 2024 Form 10-K*, at 12.

128.   These debt collection methods are so successful that EWA lenders recoup their advances at least 97% of the time using these tactics.[43]

129.   Dave discloses similar success in securing repayment in its annual reports. For instance, Dave touted the fruits of its strict underwriting and debt-collection practices in a table showing the "average 28-day delinquency rate" of ExtraCash loans with rates that are consistently low and falling:[44]

| Year | Average 28-Day Delinquency Rate |
|------|--------------------------------|
| 2020 | 4.34% |
| 2021 | 3.93% |
| 2022 | 3.65% |
| 2023 | 2.51% |

130.   In regulatory filings, Dave characterizes outstanding ExtraCash loans as "ExtraCash Receivables" which "represent outstanding originations, tips, and processing fees, net of direct origination costs, less an allowance for credit losses."[45] A chart reflecting ExtraCash receivables from Dave's 2024 annual report is reproduced below:

---

[43] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

[44] *Dave, Inc. 2024 Form 10-K*, at 8. The "28-day delinquency rate for a particular month represents the total delinquent principal disbursed in that calendar month (inclusive of the delinquent pledged instant transfer fees and tips) divided by the total receivables created in that particular calendar month." *Dave, Inc. 2023 Form 10-K*, at 8, https://investors.dave.com/static-files/c65136cf-5c00-4baa-b0cb-3b42ab862294 (last visited Mar. 30, 2025).

[45] An allowance for credit losses is a contra-asset account that represents an estimate of the expected credit losses on financial assets, like loans, that a company holds. It's essentially a reserve to cover potential losses from borrowers defaulting on their debts.

28

**Note 5 ExtraCash Receivables, Net**

ExtraCash receivables, net, represent outstanding originations, tips, and processing fees, net of direct origination costs, less an allowance for credit losses.

Below is a detail of ExtraCash receivables, net as of December 31, 2024 (in thousands):

| Days From Origination | Gross ExtraCash Receivables | Allowance for Credit Losses | ExtraCash Receivables, Net |
|---|---|---|---|
| 1-10 | $ 142,623 | $ (2,112) | $ 140,511 |
| 11-30 | 36,198 | (6,223) | 29,975 |
| 31-60 | 7,882 | (4,937) | 2,945 |
| 61-90 | 6,140 | (4,712) | 1,428 |
| 91-120 | 5,717 | (4,719) | 998 |
| Total | $ 198,560 | $ (22,703) | $ 175,857 |

131.    Dave represents that its "credit losses for the year ended December 31, 2024 was *lower* compared [to] the year ended December 31, 2023, due primarily to improved collections performance throughout the year[.]" Likewise, the "decrease in amounts written-off for [2024 compared to 2023] were also primarily as [sic] result of improved collections performance year over year despite higher ExtraCash originations, which increased to $5.1 billion from $3.6 billion year over year."

132.    As these figures and statements show, consumers are obligated to pay—and Dave expects to receive and is adept at collecting—ExtraCash funds loaned by Dave.

## **Defendants' Loans to Plaintiffs**

133.    Plaintiff, Spc. Russell was an active-duty Specialist stationed at Fort Hood in central Texas. He was an active-duty servicemember from August 2021 until January 2025.

134.    Plaintiff PFC Preston is currently a Private First Class in the U.S. Army stationed at Fort Bragg in North Carolina. He has been active-duty since July 2023 and his contract with the U.S. Army continues through July 2027.

135.    Defendants extended consumer credit to Plaintiffs in the form of ExtraCash advance transactions like those discussed above.

136.    Plaintiffs each used the loans from Dave for personal, family, or household purposes.

137.    Plaintiffs paid Dave's finance charges, in the form of Express Fees, subscription fees, tips, and overdraft service fees, to obtain cash-advance loans from Dave.

138.    A small selection of ExtraCash loans made by Defendants to Plaintiff Spc. Russell are shown in the below table, with the cost of credit and APR included:[46]

| Date | Principal Amt. | Express Fee / Tip / Total | Loan Period | APR |
|---|---|---|---|---|
| 3/4/24 – 3/13/24 | $125.00 | $6.25 / $6.25 / $12.50 | 9 days | 406% |
| 8/8/24 – 8/13/24 | $225.00 | $11.25 / $11.25 / $22.50 | 5 days | 730% |
| 8/20/24 – 8/28/24 | $100.00 | $5.00 / $5.00 / $10.00 | 8 days | 456% |

139.    A small selection of ExtraCash loans made by Defendants to Plaintiff PFC Preston are shown in the below table, with the cost of credit and APR included:

| Date | Principal Amt. | Overdraft Fee / Express Fee / Total | Loan Period | APR |
|---|---|---|---|---|
| 1/4/25 – 1/8/25 | $60.00 | $5.00 / $0.90 / $5.90 | 4 days | 897% |
| 1/6/24 – 1/8/24 | $90.00 | $5.00 / $1.35 / $6.35 | 2 days | 1,288% |
| 2/20/25 – 2/27/25 | $60.00 | $5.00 / $0.90 / $5.90 | 7 days | 513% |

140.    Plaintiffs each received many usurious loans from Defendants since they started using the service.

141.    The fees attendant to the loans (including, *inter alia*, Express Fees, subscription charges, tips, and overdraft fees) are immediately and directly connected to Defendants' extensions of credit to Plaintiffs.

142.    Further, Defendants' credit agreements required Plaintiffs to purportedly waive their right to a jury trial and waive their right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

143.    Defendants' credit agreements also failed to include substantially any mandatory credit disclosures in violation of 10 U.S.C. § 987(c) and TILA.

### Defendants Violate the MLA and the TILA

---

[46] These calculations are demonstrative and do not include, for instance, the subscription fees which must be included in the military APR calculation pursuant to 32 C.F.R. § 232.4(c)(1)(iii)(C).

CLASS ACTION COMPLAINT AND JURY DEMAND

144. The MLA prohibits a creditor from obligating a "Covered Member" to a loan that exceeds 36% MAPR. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes "finance charges associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4.

145. A "Covered Member" under the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

146. Spc. Russell, PFC Preston, and the MLA Class Members are subject to the protections and limitations imposed by the MLA. The MLA protects any consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR §§ 232.3(g)(2) and (g)(3)).

147. Spc. Russell and PFC Preston are Covered Members with respect to their loan agreements with Dave because each Plaintiff took out the loans while they were active-duty service members for personal, family, or household purposes.

148. Dave is a "creditor" subject to the requirements and limitations imposed by the MLA because it engages in the business of extending consumer credit to Covered Members. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

149. Evolve is a "creditor" subject to the requirements and limitations imposed by the MLA because it engages in the business of extending consumer credit to Covered Members. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

150. The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and not subject to any statutory exception. 32 C.F.R. § 232.3(f)(1)(i); 10 U.S.C. § 987(i)(6).

151. Defendants violate the MLA in at least four distinct ways: By (1) charging interest above the 36% statutory MAPR rate cap; (2) failing to provide any credit disclosures required by

the MLA; (3) including a Class Action Ban and Waiver of Jury Trial; and (4) including a mandatory

binding arbitration clause. See, 10 U.S.C. §§ 987(b), (c), (e)(2), (e)(6)–(7).

152.    As a result of Defendants' wholesale failure to provide substantially any of the

disclosures required by TILA, Defendants also violate 15 U.S.C. § 1638.

## **CLASS ACTION ALLEGATIONS**

153.    Plaintiffs bring this class action on behalf of themselves and all other persons

similarly situated and the general public. The proposed "MLA Class" and the "TILA Class"

(collectively the "Classes") are defined as follows:

> **MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with Dave to use its ExtraCash (or substantially similar) product, in which Dave was paid a finance charge (including, without limitation, an express fee, subscription charge, tip, or overdraft fee).

> **TILA Class**: All individuals in the United States that entered into an agreement with Dave to use its ExtraCash (or substantially similar) product, in which Dave was paid a finance charge (including, without limitation, an express fee, subscription charge, tip, or overdraft fee).

154.    Expressly excluded from the Classes are: (a) any Judge presiding over this action

and members of their families; (b) Dave and any entity in which Dave has a controlling interest, or

which has a controlling interest in Dave, and its legal representatives, assigns and successors; (c)

Evolve and any entity in which Evolve has a controlling interest, or which has a controlling interest

in Evolve, and its legal representatives, assigns and successors; and (d) all persons who properly

execute and file a timely request for exclusion from the Classes.

155.    Plaintiffs reserve the right to amend the Class definitions if further investigation and

discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

## **Numerosity and Ascertainability**

156.    Plaintiffs are unable to state the precise number of members of the classes because

such information is in the exclusive control of Defendants. Defendants' scheme has harmed and

continues to harm the members of the Classes. The members of the proposed Classes are so

numerous that joinder of all members is impracticable. Defendants have made millions of loans,

and Plaintiffs estimate there are, at least many thousands of consumers in the MLA Class and TILA

Class. As a result, Plaintiffs believe that the total Classes each number in (at least) the thousands, thus members of the Classes are so numerous that joinder of all class members is impracticable. The exact size of the proposed classes, and the identity of the members thereof, will be readily ascertainable from the business records of Defendants.

157.    The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Defendants' possession, custody, or control.

<u>**Commonality**</u>

158.    There are common questions of law and fact affecting the rights of each Class member and common relief by way of damages. The harm that Defendants have caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

- Whether Plaintiffs and the MLA Class members are Covered Members subject to the protections and limitations of the MLA;
- Whether Dave is a "creditor" subject to the protections and limitations of the MLA;
- Whether Evolve is a "creditor" subject to the protections and limitations of the MLA;
- Whether Defendants' loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;
- Whether Defendants entered into standard form loan agreements with Covered Members;
- Whether Defendants' loans exceed the MLA statutory rate cap of 36% MAPR;
- Whether Defendants failed to provide required credit disclosures in violation of the MLA;
- Whether Defendants' standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;
- Whether Defendants' standard form loan agreements contain an arbitration clause in violation of the MLA;
- Whether Defendants failed to provide required credit disclosures in violation of

CLASS ACTION COMPLAINT AND JURY DEMAND

TILA;

- Whether each month Defendants charged interest to Plaintiffs and Class Members it restarted the statute of limitations under the MLA;

- Whether each month that Plaintiffs and the Class Members paid money to Defendants it restarted the statute of limitations under the MLA;

- Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

- Whether Defendants should be enjoined from continuing their lending practices in the manner challenged herein;

- Whether Defendants are subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Plaintiffs and the Classes are entitled under 10 U.S.C. § 987(f)(5); and

- Any declaratory and/or injunctive relief to which the Classes are entitled.

**Typicality**

159.    The claims and defenses of Plaintiffs are typical of the claims and defenses of the MLA Class because Plaintiffs are Covered Members and loan agreements with Defendants are typical of the type of personal, household, or family loans that Defendants normally provide to Covered Members. Additionally, Defendants use the same or substantially similar standard form loan agreement in all of their lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. For similar reasons, the claims and defenses of Plaintiffs are typical of the claims and defenses of the TILA Class. Plaintiffs suffered damages of the same type and in the same manner as the Classes they seek to represent. There is nothing peculiar about Plaintiffs' claims. Plaintiffs have no interests antagonistic to the interests of the other members of the Classes.

**Adequate Representation**

160.    Plaintiffs will fairly and adequately assert and protect the interests of the Classes. Plaintiffs have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Plaintiffs have no conflict of interest that will

CLASS ACTION COMPLAINT AND JURY DEMAND

1  interfere with maintenance of this class action.

2     161.    Plaintiffs and their counsel are committed to vigorously prosecuting the action on

3  behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel

4  have interests adverse to those of the Classes.

5                                   **Predominance and Superiority**

6     162.    The common questions of law and fact set forth herein predominate over any

7  questions affecting only individual Class members. A class action provides a fair and efficient

8  method for the adjudication of this controversy for the following reasons which is superior to the

9  alternative methods involved in individual litigation:

10   • The Classes are so numerous as to make joinder impracticable. However, the Classes

11      are not so numerous as to create manageability problems. There are no unusual legal

12      or factual issues that would create manageability problems. Prosecution of separate

13      actions by individual members of the Classes would create a risk of inconsistent and

14      varying adjudications against Defendant when confronted with incompatible

15      standards of conduct;

16   • Adjudications with respect to individual members of the Classes could, as a practical

17      matter, be dispositive of any interest of other members not parties to such

18      adjudications, or substantially impair their ability to protect their interests; and

19   • The claims of the individual Class members are small in relation to the expenses of

20      individual litigation, making a Class action the only procedural method of redress in

21      which Class members can, as a practical matter, recover.

22   163.    The proposed Classes fulfill the certification criteria of Code of Civil Procedure §

23  382.

24                                    **FIRST CAUSE OF ACTION**
                           **(Violations of the Military Lending Act, 10 U.S.C. § 987, *et seq*.)**
25       **(On Behalf of Plaintiffs and the MLA Class against Defendant Dave and applicable DOES)**

26   164.    Plaintiffs re-allege and incorporate by reference herein the allegations set forth in

27  paragraphs 1–163 above.

28   165.    The MLA prohibits a creditor from obligating a "Covered Member" or dependent

35

1    of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

2    166.    A "Covered Member" in the statute is a "member of the armed forces who is on

3    active duty under a call or order that does not specify a period of 30 days or less."

4    167.    "The MAPR is the cost of the consumer credit expressed as an annual rate." 32

5    C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the

6    consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer

7    credit." 32 C.F.R. § 232.4.

8    168.    Plaintiffs and the MLA Class Members are "Covered Members," subject to the

9    protections and limitations imposed by the MLA. A Covered Member is a consumer who, at the

10   time the consumer becomes obligated on a consumer credit transaction or establishes an account

11   for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member

12   (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

13   169.    Plaintiffs are considered a "Covered Member" with respect to their loan agreements

14   with Dave because when they received the loans in question, Plaintiffs were active-duty service

15   members, obligated to repay loans taken out for personal, family or household purposes.

16   170.    Dave is a "creditor" subject to the requirements and limitations imposed by the MLA

17   in that it engages in the business of extending consumer credit to Covered Members protected by

18   the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

19   171.    The underlying loan transactions at issue in this case constitute "consumer credit"

20   subject to the protections and limitations imposed by the MLA because they are "credit offered or

21   extended to a Covered Member primarily for personal, family, or household purposes," subject to

22   a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i);

23   also 10 U.S.C. § 987(i)(6).

24   172.    Dave charged Plaintiffs and the MLA Class well above the 36% interest rate cap on

25   their loans, in violation of the MLA.

26   173.    Dave fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32

27   C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

28   174.    Dave's standard form loan agreements include mandatory arbitration agreements in

CLASS ACTION COMPLAINT AND JURY DEMAND

1    violation of 10 U.S.C. § 987(e)(3).

2        175.    Dave's standard form loan agreements include class action waivers trial waivers in

3    violation of 10 U.S.C. § 987(e)(2)

4        176.    As a result, Dave violates 10 U.S.C. § 987.

5        177.    Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class,

6    Plaintiffs seek an order from the Court awarding statutory damages against Dave in the amount of

7    $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C.

8    § 987(f)(5)(A).

9        178.    Plaintiffs are entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C.

10   § 987(f)(5)(B).

11       WHEREFORE, Plaintiffs pray for relief as set forth below.

12                              **SECOND CAUSE OF ACTION**
13                    **(Violations of the Military Lending Act, 10 U.S.C. § 987, _et seq._)**
             **(On Behalf of Plaintiffs and the MLA Class against Defendant Evolve and applicable**
14                                          **DOES)**

15       179.    Plaintiffs re-allege and incorporate by reference herein the allegations set forth in

16   paragraphs 1–163 and 165–169 above.

17       180.    Evolve is a "creditor" subject to the requirements and limitations imposed by the

18   MLA in that it engages in the business of extending consumer credit to Covered Members protected

19   by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

20       181.    The underlying loan transactions at issue in this case constitute "consumer credit"

21   subject to the protections and limitations imposed by the MLA because they are "credit offered or

22   extended to a Covered Member primarily for personal, family, or household purposes," subject to

23   a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i);

24   also 10 U.S.C. § 987(i)(6).

25       182.    Evolve charged Plaintiffs and the MLA Class well above the 36% interest rate cap

26   on their loans, in violation of the MLA.

27       183.    Evolve fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32

28   C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

EXHIBIT B
Page 43

184. Evolve's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

185. Evolve's standard form loan agreements include class action waivers trial waivers in violation of 10 U.S.C. § 987(e)(2)

186. As a result, Evolve violates 10 U.S.C. § 987.

187. Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class, Plaintiffs seek an order from the Court awarding statutory damages against Evolve in the amount of $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. § 987(f)(5)(A).

188. Plaintiffs are entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CAUSE OF ACTION
### (Violations of the Truth In Lending Act, 15 U.S.C. § 1601, *et seq.*)
### (On Behalf of Plaintiffs and the Class against Defendant Dave and applicable DOES)

189. Plaintiffs re-allege and incorporate by reference herein the allegations set forth in the paragraphs 1–163 above.

190. TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. Dave's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

191. Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

192. Dave is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's

1    disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

2        193.    Dave has not provided such disclosures before consummation of the loan

3    agreements.

4        194.    Dave failed to provide such disclosures to Plaintiffs and the TILA Class.

5        195.    As a result, Dave violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§

6    1026.17 & 1026.18.

7        196.    Accordingly, pursuant to 15 U.S.C. § 1640, on behalf of the TILA Class, Plaintiffs

8    seek an order from the Court awarding actual damages and statutory damages and attorneys' fees

9    and costs against Dave.

10        WHEREFORE, Plaintiffs pray for relief as set forth below.

11                    **FOURTH CAUSE OF ACTION**
              **(Violations of the Truth In Lending Act, 15 U.S.C. § 1601, *et seq.*)**
12    **(On Behalf of Plaintiffs and the Class against Defendant Evolve and applicable DOES)**

13        197.    Plaintiffs re-allege and incorporate by reference herein the allegations set forth in

14    the paragraphs 1–163 and 190–191 above.

15        198.    Evolve is a creditor whose financing qualifies as "credit" under TILA and

16    Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation

17    Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

18        199.    Evolve has not provided such disclosures before consummation of the loan

19    agreements.

20        200.    Evolve failed to provide such disclosures to Plaintiffs and the TILA Class.

21        201.    As a result, Evolve violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R.

22    §§ 1026.17 & 1026.18.

23        202.    Accordingly, pursuant to 15 U.S.C. § 1640, on behalf of the TILA Class, Plaintiffs

24    seek an order from the Court awarding actual damages and statutory damages and attorneys' fees

25    and costs against Evolve.

26        WHEREFORE, Plaintiffs pray for relief as set forth below.

27                    **PRAYER FOR RELIEF**

28        WHEREFORE, on behalf of the Classes, Plaintiffs pray for judgment against Dave, Inc.,

CLASS ACTION COMPLAINT AND JURY DEMAND

and Evolve Bank & Trust as follows:

    a.  That the Court determine that this action may be litigated as a class action and that Plaintiffs and their counsel be appointed class representative and class counsel, respectively;

    b.  That the Court enter judgment against Dave and Evolve and in favor of Plaintiffs and the Classes on all counts;

    c.  That the Court find and declare that that Plaintiffs and MLA Class Members' standard form loan agreements violate the MLA;

    d.  That the Court find and declare that Defendants violated the MLA and award Plaintiffs and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

    e.  That the Court award Plaintiffs and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

    f.  That the Court find and declare that Defendants violated TILA and award Plaintiffs and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

    g.  That the Court enjoin Defendants from continuing to engage in predatory lending practices in violation of the MLA and TILA;

    h.  That Defendants be required by this Court's Order to compensate Plaintiffs' counsel for their attorneys' fees and costs of suit, and that Defendants be ordered to bear the cost of notice to the absent class members, as well as the administration of any common fund;

    i.  That the Court award interest as allowable by law;

    j.  That the Court award reasonable attorneys' fees as provided by applicable law, including under the MILA, the TILA, and/or Code of Civil Procedure § 1021.5;

    k.  That the Court award all costs of suit; and

    l.  That the Court award such other and further relief as the Court may deem just and proper.

CLASS ACTION COMPLAINT AND JURY DEMAND

1    Dated:  March 31, 2025                    Respectfully submitted,

2

3                                             /s/ Joseph Henry (Hank) Bates, III
                                              Joseph Henry (Hank) Bates, III (SBN 167688)
4                                             hbates@cbplaw.com
                                              **CARNEY BATES & PULLIAM, PLLC**
5                                             One Allied Drive, Suite 1400
                                              Little Rock, AR 72202
6                                             Telephone: (501) 312-8500
                                              Facsimile: (501) 312-8505
7
                                              *Attorneys for Plaintiffs Michael Russell, Joseph*
8                                             *Preston, and the Proposed Classes*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT AND JURY DEMAND

**EXHIBIT B
Page 47**

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs hereby demand a trial by jury of each and every cause of action so triable.

3

4       Dated: March 31, 2025                     Respectfully submitted,

5
                                                  _/s/ Joseph Henry (Hank) Bates, III_
6                                                 Joseph Henry (Hank) Bates, III (SBN 167688)

7                                                 *Attorneys for Plaintiffs Michael Russell, Joseph*
                                                  *Preston, and the Proposed Classes*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT B
Page 48