**CARNEY BATES & PULLIAM, PLLC**
Hank Bates (SBN 167688)
hbates@cbplaw.com
Randall K. Pulliam (*pro hac vice forthcoming*)
rpulliam@cbplaw.com
Lee Lowther (*pro hac vice*)
llowther@cbplaw.com
Courtney Ross Brown (*pro hac vice*)
cbrown@cbplaw.com
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone:  (501) 312-8500

**JACOBSON PHILLIPS PLLC**
Joshua R. Jacobson (*pro hac vice*)
joshua@jacobsonphillips.com
2277 Lee Road, Suite B
Winter Park, FL 32789
Telephone: (321) 447-6461

**WADE KILPELA SLADE LLP**
Gillian L. Wade (SBN 229124)
gwade@waykayslay.com
Sara D. Avila (SBN 263213)
sara@waykayslay.com
Collins Kilgore (SBN 295084)
ckilgore@waykayslay.com
2450 Colorado Ave., Ste. 100E
Santa Monica, California 90404
Telephone: (310) 396-9600

*Attorneys for Plaintiffs Michael Russell, Joseph Preston, James Tosches, and the Proposed Classes*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL RUSSELL, JOSEPH PRESTON, and JAMES TOSCHES, individually, on behalf of all others similarly situated, and on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>DAVE, INC., a Delaware corporation, and EVOLVE BANK & TRUST,<br><br>Defendants. | Case No.: 2:25–cv–04029–MRA–MAA<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF FOR VIOLATIONS OF:**<br>  (1) **MILITARY LENDING ACT, 10 U.S.C. § 987, *et seq.*;**<br>  (2) **TRUTH IN LENDING ACT, 15 U.S.C. § 1601, *et seq.*; and**<br>  (3) **GEORGIA PAYDAY LOAN ACT, O.C.G.A. § 16-17-2, *et seq.***<br><br>**Unlimited Civil Case**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Michael Russell, a Specialist in the U.S. Army ("Spc. Russell"), Joseph Preston, a Private First Class in the U.S. Army ("PFC Preston"), and James Tosches, a Staff Sergeant in the U.S. Army ("SSG Tosches") (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, and on behalf of the general public, hereby file this Amended[1] Class Action Complaint and allege the following based upon personal knowledge as to themselves and upon information and belief and the investigation of his counsel as to all other matters, and bring this Amended Class Action Complaint against Dave, Inc. ("Dave") and its bank partner, Evolve Bank & Trust ("Evolve") (collectively, "Defendants"), and allege as follows:

## **NATURE OF THIS ACTION**

1.      This Complaint seeks to protect victims of Dave's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA"), the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), and the Georgia Payday Loan Act ("PLA"), O.C.G.A. § 16-17-2, *et seq.*

2.      Dave—and its banking "partner," Evolve—are in the business of payday lending through an earned wage access ("EWA") product. Acting together, Defendants make funds available to customers, who repay principal and finance charges (including expedited transfer fees, subscription charges, so-called "tips" for most of the class period, and, of late, "overdraft fees") on payday.

3.      Dave's business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Indeed, Dave markets

---

[1] Plaintiffs file this amended complaint under Fed. R. Civ. P. 15(a)(1)(B), which allows Plaintiffs to amend "once as a matter of course" within "21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b) , (e) , or (f) , whichever is earlier." On June 11, 2025, Defendants filed their Motion to Dismiss Class Claims and Stay Individual Claims in Favor of Arbitration, or for Alternative Relief (ECF No. 26), which seeks relief under Rule 12(b). Even if it didn't, "courts generally agree that" motions to compel arbitration qualify as "a responsive pleading, which, under Rule 15(a)(1)(B), grants Plaintiff leave to amend as a matter of right." *See Dog Training Elite Franchising LLC v. Unbound Ventures LLC*, No. CV-24-01861-PHX-SMM, 2025 U.S. Dist. LEXIS 55931, at *4 (D. Ariz. Mar. 26, 2025).

to consumers it considers "financially vulnerable" or "financially coping," including those whose spending exceeds their income, who have minimal savings, and who overdraft their bank accounts frequently.

4.      Despite advertising its loans as "no interest" and promising no mandatory fees, in practice, Dave regularly takes in **triple- and quadruple-digit** finance charges on loans it issues. These APRs can reach absurd heights, with Defendants making loans to Plaintiffs approaching **1,300% MAPR**. The end result is a financial product that extracts exorbitant fees from workers, encourages serial usage and dependance on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

5.      Plaintiffs are both users of Dave's cash advance product, "ExtraCash." By virtue of the sky-high fees charged to borrow against their future salary, Dave and its partner, Evolve, have extended consumer credit and loans to Plaintiffs on numerous occasions in violation of the MLA, TILA, and PLA.

6.      Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products can trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders.

7.      Considering the substance of the transactions, Dave's ExtraCash loan transactions are extensions of consumer credit. Through its ExtraCash product, Dave disburses funds to people like Plaintiff on the promise of repayment of the sum plus various fees at a later time. Defendants' attempt to structure the product as an "overdraft service" reflects an ineffectual attempt to sidestep consumer protection laws and regulations designed to protect people from predatory loan products.

8.      The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Members") from predatory

lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, Dave makes no effort to fulfill its duty to determine whether it is lending to Covered Members or to provide legally mandated protections for them.

9.     In violation of the MLA, Defendants uses the Dave ExtraCash advance product to saddle Covered Members with charges that, on average, yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

10.    Dave's consumer credit agreements violate the MLA in at least five ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any credit disclosures required by the MLA; (3) including a purported class action ban and waiver of jury trial; (4) including a mandatory binding arbitration clause; and (5) using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. §§ 987(b), (c) & (e)(1)(2)(5)(6).

11.    And despite Georgia outlawing payday lending, Defendants have offered their short-term, high-cost cash-advance product to Georgia consumers for years. In violation of Georgia law, Defendants have used this product to extract from Georgia consumers charges that yield annual percentage rates ("APRs") drastically exceeding the legal limit.

12.    Dave and its partner, Evolve, systematically violate the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

13.    Among the abusive lending practices that the MLA was designed to curb was predatory payday loans made to servicemembers.[2] In a Department of

---

[2] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.

Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[3] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[4] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[5]

14.    Defendants' business practices violate the MLA, TILA, and PLA and are part of a systematic nationwide policy and practice. Plaintiffs seek to hold Defendants accountable for their actions and prevent their predatory lending practices from continuing.

## PARTIES

15.    Plaintiff, Spc. Russell, is an individual, over 18 years of age. At all times relevant, Spc. Russell was a natural person and resident of Tacoma, Washington. He has been a member of the U.S. Army since August 2021. During the class period, Spc. Russell was a Covered Member and an active-duty service member employed by the U.S. Army.

16.    Plaintiff, PFC Preston, is an individual, over 18 years of age. At all relevant times, PFC Preston was a natural person and resident of North Carolina. He has been a member of the U.S. Army since July 2023. During the class period, PFC Preston was a Covered Member and an active-duty service member employed by the U.S. Army.

17.    Plaintiff, SSG Tosches, is an individual, over 18 years of age. At all

---

[3] *Id.* at 10–16.
[4] *Id.* at 10–11.
[5] *Id.* at 11.

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

relevant times, SSG Tosches was a natural person and resident of Hinesville, Georgia. He has been a member of the U.S. Army since July 2014. During the class period, SSG Tosches was a Covered Member and an active-duty service member employed by the U.S. Army.

18.    Defendant Dave, Inc., is a Delaware corporation with its principal place of business at 1265 S. Cochran Ave., Los Angeles, California. Dave has offered loan agreements to consumers, including Covered Members, since at least 2017, entering into millions of credit transactions.

19.    Defendant Evolve Bank & Trust is a bank organized under the laws of Arkansas with locations in California. Evolve's corporate headquarters and principal place of business is located at 6000 Poplar Avenue, Suite 300, Memphis, Tennessee 38119. Evolve acts as Dave's "bank partner" and purportedly facilitates the ExtraCash product.

## TOLLING OF THE STATUTE OF LIMITATIONS

20.    The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, *et seq.*, tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to Plaintiffs, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## JURISDICTION AND VENUE

21.    Venue is proper in the County of Los Angeles because Defendant Dave is headquartered in Los Angeles County, coordinated business operations in California, did business in California and in Los Angeles County, and committed the wrongful acts alleged herein in Los Angeles County. Venue is further proper in

this Court because a substantial portion of the conduct complained of occurred in Los Angeles County.

22.    This Court has jurisdiction over Dave, because it, at all times relevant herein, was qualified to do business and regularly conducted business in California.

23.    This Court has jurisdiction over Evolve, because it, at all times relevant herein, was qualified to do business and regularly conducted business in California.

24.    Furthermore, the terms of service provided on Dave's website provide for jurisdiction and venue of suits relating to Defendants' services in "the federal or state courts of Los Angeles County, California."

## **LEGAL BACKGROUND**

### **The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered Members**

25.    The DoD's Report on lending practices discussed the payday lending industry at length.[6] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[7]

26.    Military populations are targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[8] Moreover, the military payment architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are

---

[6] Report, *supra* n.2.
[7] *Id.* at 10–11.
[8] *Id.* at 11.

subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[9]

27.    Similarly, the "military culture emphasizes financial responsibility, with basic policy explicitly stating that Service members are to pay their just debts."[10]

28.    While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and 'military loans' via the Internet."[11] Those loans, like Dave's, "are delivered and collected online through electronic fund transfer."[12]

29.    The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate Dave's business model:

(1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued

---

[9] *Id.* at 14. To be sure, EWA providers like Dave do not collect physical checks from their customers at loan initiation, but instead takes a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.

[10] *Id.* at 10.

[11] *Id.* at 15.

[12] *Id.* at 16.

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[13]

(3) . . . Increasingly the Internet is used to promote loans to Service members.

(4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

. . .

(6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[14]

30.    The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[15]

31.    The Report also discussed the particular harms posed by small loans, noting short-term, small-dollar loan products "strip earnings or savings from the borrower; place the borrower's key assets at undue risk; do not help the borrower resolve their financial shortfall; trap the borrower in a cycle of debt; and leave the borrower in worse financial shape than when they initially contacted the lender."[16]

32.    As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action

---

[13] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.
[14] *Id.* at 21–22.
[15] *Id.* at 39.
[16] *Id.* at 3.

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

(ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[17]

33.    Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[18]

34.    To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[19]

35.    The American Bar Association and others expressed support for the DoD's request, noting the urgent need for remedial Congressional action to curb predatory loan practices harming Service members. The legislation requested was supported by the DoD, military and veterans organizations, legal aid organizations, consumer advocacy groups, faith-based organizations, and of course lawmakers.

36.    Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

## **The Military Lending Act**

37.    In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

38.    The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer

---

[17] *Id.* at 41–42.

[18] *Id.* at 46.

[19] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

39.    The MLA also requires mandatory disclosures in "consumer credit"[20] transactions with Covered Members, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

40.    Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that require the Covered Borrower to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

41.    The MLA also makes it unlawful to charge a Covered Member any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

### The Truth in Lending Act

42.    The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

43.    Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those Dave offers here. Dave fails to make any of the following required disclosures:

---

[20] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions. 32 CFR § 232.3(f)(1).

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

- "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

- "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *Id.* at § 1638(2)(B);

- "The 'finance charge', not itemized, using that term," *Id.* at § 1638(3);

- "The finance charge expressed as an 'annual percentage rate', using that term," *Id.* at § 1638(4);

- "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *Id.* at § 1638(6);

- "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *Id.* at § 1638(8);

- "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *Id.* at § 1638(9);

- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *Id.* at § 1638(11); and

- "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *Id.* at § 1638(12).

### **The Georgia Payday Loan Act**

44.     Payday lending involves offering short-term loans, often for small amounts, with repayment expected on the borrower's next payday. These loans are

frequently marketed as a quick solution for bridging financial gaps between paychecks.

45.    Payday loans are not a new invention; they have been offered for decades. While they have taken many forms, one of the unifying characteristics of payday lending has been that lenders have created different artifices, evolving contractual arrangements, and inventive structures to evade usury caps for such loans.

46.    In the past, lenders disguised payday loans as "wage buying," where lenders claimed to be purchasing earned wages, although in reality they were simply issuing loans at usurious rates.

47.    Georgia's first major legislative enactment aimed at stopping payday lending was the Industrial Loan Act ("ILA"). The legislation was passed because short-term, high-cost loans trap consumers in a cycle of debt. The cycle perpetuates itself because fees charged in conjunction with payday loans reduce borrowers' paychecks and net pay each period, necessitating borrowers to obtain new loans to cover the shortfall created by the original loans.

48.    In response to the scourge of "short-term cash advances" making a comeback in Georgia, the Attorney General issued Official Opinion 2002-3 that addressed the practices of "many lenders" who had "developed schemes intended to disguise the true character of the payday loan transaction." The Attorney General observed that "Payday loans have been recognized by many courts, in Georgia and elsewhere, as a pretext for usury" and warned that the then-novel disguised payday loans were illegal under Georgia law.

49.    Notwithstanding the ILA and Attorney General opinion condemning disguised payday lending, the practice flourished in the late 1990s and 2000s in newly structured transactions, such as deferred presentments, in which the lender advanced money in exchange for a postdated check, which it agreed not to cash until a specified future date (typically the borrower's next payday).

50.    To stop these evasions, in 2004, Georgia enacted the Payday Lending Act ("PLA"). The PLA "encompasses all transactions in which funds are advanced to be repaid at a later date, notwithstanding the fact that the transaction contains one or more other elements." O.C.G.A. § 16-17-1(a).

51.    The PLA prohibits lenders from collecting any amounts on payday loans, deems payday loans void and unenforceable, and subjects payday lenders to liability for statutory damages in an amount equal to three times any charges made on an illegal payday loan. *Id.* § 16-17-3.

52.    As history teaches, payday lending is simply too profitable an enterprise for some lenders to resist. EWA products represent the newest generation artifice to attempt to evade Georgia usury law and bilk consumers through a short-term, high-cost payday loan product.

53.    EWA providers' cash-advance loan products (including Defendants') offer cash to borrowers in return for the authorization to debit the borrower's bank account on their payday in an amount equal to the principal cash-advance loan amount and any additional charges.

54.    Defendants' ExtraCash product falls within the scope of the PLA because it is a "transaction[] in which funds are advanced to be repaid at a later date." O.C.G.A. § 16-17-1(a).

## FACTS

### The Earned Wage Product Market and Dave

### EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health

55.    A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards,

personal installment loans, and payday loans.

56.    Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—has been created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

57.    EWA products provide workers, before their payday, with a portion of their earned but unpaid wages or to funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

58.    Defendant Dave is one such fintech company that (in partnership with Evolve) provides an EWA service, which it calls "ExtraCash". The ExtraCash service is a cash advance whereby Dave loans customers funds that are repaid on their next payday. Dave describes ExtraCash as a product intended to allow borrowers to tap into a "cash reserve" (*i.e.*, money on demand) for personal use paying bills and expenses.

59.    On its website, Dave prominently advertises, "Up to $500 in 5 minutes or less" with ExtraCash. Likewise, Dave promises that with ExtraCash, its customers can "get the money you need with no credit check, interest, or late fees."

60.    ExtraCash loans are "repayable on demand."

61.    To access ExtraCash loans, users must first link their bank account to their Dave profile and authorize Dave to collect repayment through automated debits from their connected debit card on the scheduled repayment date.

62.    Dave advertises its ExtraCash product as "interest-free money" while obscuring the ways in which it bilks consumers for fees and other finance charges that add up to loan-shark rates.

63.    For most of the class period, Dave was paid through three types of fees: (1) expedite fees, (2) mandatory subscription fees, and (3) tips.

64.    Recently, after being sued by the Department of Justice, Dave ceased collecting tips, changed the structure of its expedite fees, and began charging a fourth type of fee: (4) a "simplified" overdraft service fee on all transactions. Each of Dave's fees is discussed below.

65.    First, **expedite fees** (alternatively known as "Express Fees" or "instant transfer fees") are charged to provide instant access to loan funds. For ExtraCash loans, before early 2025, Defendants charged between $3.00 and $25.00, depending on the size of the advance taken and whether the ExtraCash loan was disbursed to an external account or a bank account maintained by Dave.

66.    The actual cost to provide customers with instant access to funds is less than $0.05.[21]

67.    In February 2025, Dave completed a change in fee architecture that resulted in a reduction in the amounts it charges for instant transfer fees. Since February 2025, users must pay a 1.5% Express Fee to obtain instant access to their funds to their external bank account—substantially lower than the prior $3.00–$25.00 instant fee schedule.

68.    Dave achieved this fee reduction in large part by shifting revenues previously received through expedite fees to its newly-minted mandatory overdraft service fee, discussed *infra*.

69.    Dave's website, app, and marketing include numerous representations about the speed of access to funds, emphasizing customers can receive cash "instantly," "on the spot," "now," and "in under 5 minutes," telling consumers that "[a]ll you have to do is download this app," and that they will pay "no interest" and "no hidden fees."

70.    Despite its prominent advertisements of instant access to funds without

---

[21] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

hidden fees, borrowers must pay an additional fee that is not meaningfully disclosed until after they provide Dave access to their bank accounts and try to take out a cash advance.

71.    Dave's only references to Express Fees in its advertising or at the app stores typically appear in small print, are buried in block text, use vague or confusing language, and/or are found in obscure locations, and do not state that unless consumers pay an Express Fee, Dave will require them to wait two to three business days before receiving their advance.

72.    The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is generally a less-than two-week liquidity problem.

73.    While expedite fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, the free, non-expedited version of an advance usually take 2–3 banking days for users to receive, while the expedited service takes just a few minutes. This delay is problematic for Dave's intended users, consumers living paycheck to paycheck who turn to EWA providers for the precise reason that their need for cash is urgent and cannot wait.

74.    Indeed, a recent study found that the average loan term for loans provided by Dave was only 10.5 days.[22] Consumers who cannot wait ten days to access their wages certainly will pay whatever fees an EWA provider charges to obtain their funds as quickly as possible. As a result, the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement.[23]

---

[22] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr. 2024) (hereinafter "*Not Free*").

[23] One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster. *Not Free*, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by consumers using employer-integrated EWA providers were for expedite fees. Consumer

75.    Turning to the second type of fee, **subscription charges** are monthly fees Dave charges its users to be eligible to apply for Dave ExtraCash loans.

76.    Dave forces users signing up to its service through its app to agree to a $1.00 monthly subscription to gain access to the ExtraCash loan product.

77.    Dave does not allow users to obtain an ExtraCash loan without first enrolling in the automatically recurring charge. Dave continues to charge users this unavoidable fee each month unless the user takes affirmative action to cancel it.

78.    There is no mechanism available through Dave's app to sign up for ExtraCash loans without first agreeing to monthly subscription charges.

79.    Dave's subscription practices have received significant criticism—from both inside and outside Dave—and are the subject of an enforcement action initially brought by the Federal Trade Commission ("FTC") and subsequently referred to the Department of Justice.[24]

80.    Turning to the third type of fee (charged by Dave until February 2025), "**tips**" are simply additional funds the lender prompts the user to pay.

81.    These purported "tips" serve no purpose whatsoever to Dave customers and instead go directly to Dave's bottom line.

82.    Dave deployed techniques borrowed from behavioral economics to pressure users into tipping each time they obtain an EWA loan. The California Department of Financial Protection and Innovation ("DFPI") has analyzed Dave's and other lenders' tipping programs and documented the "multiple strategies that lenders use to make tips almost as certain as required fees," including "[s]etting default tips and using other user interface elements to mak[e] tipping hard to avoid; [m]aking it difficult to set a $0 tip or not advertising that a particular payment is

---

Financial Protection Bureau, Data Spotlight: Developments in the Paycheck Advance Market (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.

[24] *United States v. Dave, Inc.*, No. 2:24-cv-09566-MRG-AGR, Am. Compl., ECF No. 44 (C.D. Cal. Dec. 30, 2024) (hereafter "DOJ Compl.").

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

optional; and [c]laiming that tips are used to help other vulnerable consumers or for charitable contributions."[25]

83.    Dave deployed each of these dark patterns to coerce its customers into paying as many expensive tips as possible in connection with its loan products.

84.    Here's how it worked: After applying for a loan from Dave, Dave presented consumers with a screen that it uses to charge them a "tip." Dave did not make clear to consumers that they were agreeing to an additional charge or that the tip is "optional." An example of this screen is below, headed "Your advance is on its way!":



---

[25] *2021 Earned Wage Access Findings*, CAL. DEP'T FIN. PROTEC. & INNOVATION, at 61–62 (March 2023), https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf (hereinafter "DFPI Findings").

85.    A large green button labeled "Thank you!" appears at the bottom of the screen. Users who simply tap the "Thank you!" button are charged an extra 15% of their advance. Dave calls this charge a "tip."

86.    As Dave was well aware, many borrowers tap the "Thank you!" button without knowing that Dave is charging an extra 15% fee on top of the cost of the advance. At all relevant times, Dave failed to mention the charge in its advertising, and consumers who opened the Dave app for the first time and proceed directly to attempt to take an advance would not encounter any mention of this charge, or how to avoid being subject to it, before granting Dave access to their bank accounts.

87.    Because of the way in which they were presented, many consumers did not realize they were paying the extra purported "tip" charges, while others believed this extra charge to be an unavoidable part of Dave's advance process.

88.    Internal Dave documents show Dave has been aware it charges consumers for "tips" without their knowledge and that the Dave app's interface leads consumers to believe tipping charges are unavoidable. For instance, an internal analysis of customer service data reflects that "[m]embers are still unaware they left a tip when they advance" and that consumers are "upset" about these charges. The analysis notes that consumers are "having a hard time" avoiding being charged Dave's preset "tip" of 15% and recommended that Dave "provide better visibility" about how to avoid the charge. Dave did not implement the recommendation to make clear to consumers how to avoid the charge.

89.    An internal Dave study found that "Didn't want to pay tip" was among the top sources of user complaints. Another internal Dave document listed "[n]o clear option to not tip" as a "Pain-Point[]" for consumers. The document also recommended, as the top of a list of "Future Initiatives," adding a "[n]o tip button." Dave did not add this button.

90.    In addition to deceiving consumers about whether they were being charged, and if tips were required, Dave misleadingly represented that, based on the

payment of a specified tip level, Dave would pay for or donate a specified number of "healthy meals" to children in need.

91.     The tip screen screenshot above (*supra* ¶ 84) includes representations that tips "provide a meal for every % you tip" – so, instead of asking consumers to tip 10%, 15%, or 20%, the app purports to have consumers choose whether to tip "10 Healthy Meals," "15 Healthy Meals," or "20 Healthy Meals." The tip screen includes images of a child with a spoon surrounded by nine food items.

92.     During the relevant period, the default tip was 15% of the loan. When a consumer tapped the "20 Healthy Meals" prompt, the number of food items around the child increases to twelve. If the consumer taps on "10 Healthy Meals," the number of food items around the child drops.

93.     To avoid paying a "tip," users had to figure out to first tap the "Leave a custom tip" button, which is about half as long as the "Thank you!" button and— unlike the "Thank you!" button, which is colored green against a white background—is colored white against a white background. If consumers tap this button, the three labeled boxes are replaced with a horizontal "slider."

94.     Initially, above the slider in large, bold-print text appear with the words "15 Healthy Meals" and another image of the cartoon child holding a spoon and surrounded by food items.

95.     If the user moved the slider to the right, the number of "Healthy Meals" displayed increases incrementally up to 25. As the count of "Healthy Meals" increased, more food items appear around the cartoon child, with twenty-five items filling the screen when the count of "Healthy Meals" reaches 25:



96.    If the user moved the slider left, the number of "Healthy Meals" displayed decreased incrementally down to 0. As the slider moves to the left and the count of "Healthy Meals" decreases, food items disappear from around the child. If the count of "Healthy Meals" reaches 2, the only items around the child are bread and water.

97.    To avoid paying any tip, the consumer must move the slider fully to the left to reduce the count of "Healthy Meals" to zero. The slider then turns from green to red, the text of the large green button at the bottom of the screen changes from "Thank you!" to "No tip," and the image of the child is replaced by an image of an empty plate with a fork and spoon:

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    98.    The combination of imagery and bold-print language about the number

16   of "Healthy Meals" tied to tips led consumers to believe that, if the consumer

17   permitted Dave to charge a large "tip," Defendants would donate that money to

18   charity or pay for or donate a specified number of meals to children in need, based

19   on the size of the "tip."

20    99.    In reality, Dave did not pay for or donate a specified number of meals

21   to children in need based on its user "tips." Instead, for each percentage point of a

22   "tip" charged, Dave would donate only ten cents and keep the rest. For example, if

23   a consumer were to tap the "Thank you!" button and donate on the "15 Healthy

24   Meals" option, Dave would not pay for or donate "15 Healthy Meals," but would

25   instead donate only $1.50 to a hunger relief organization: far less than it would cost

26   to buy 15 meals or to purchase and prepare the food for 15 meals.

27
28

100.   Dave employees have internally described Dave's interface—and the ways in which they collect tips—as a "dark pattern" that had been criticized by "designers and members."

101.   Dave internal documents acknowledge this "Healthy Meals" screen content is misleading. Multiple Dave executives described the "Healthy Meals" content of these screens as involving a "dark / guilt inducing design pattern" that helps drive revenue. Others recognized the "hungry child def[initely] leaves us open for criticism" and exhibits "very questionable design decisions."

102.   These tips proved too profitable to abandon—until, that is, they were sued by the FTC and DOJ for their tipping conduct and created a new fee to replace tip-derived revenue (*see infra*). Dave reported receiving more than $67,000,000 in tips in 2024 alone, approximately 19% of the company's revenue for that year.[26]

103.   The weaponization of dark patterns and strategies from behavioral economics—used by Dave and other EWA providers—turned tips into a huge revenue source. A recent data summary found that EWA providers that request tips receive them in 73% of transactions, on average $4.09 in tips per transaction.[27]

104.   Turning to the fourth type of fee, **overdraft service fees** are mandatory fees applied for users to access an ExtraCash advance.

105.   Dave recently wrote about its transition to overdraft service fees: "The optional fee model, which allowed members to access credit for as little as $0 per transaction, has been replaced with a simplified 5% fee structure including a $5 minimum and $15 cap." Dave's 10-K characterizes the new fee as a "simplified 5% overdraft service fee."

---

[26]   *Dave Inc. 2024 Form 10-K*, at p. 50, available at https://investors.dave.com/static-files/7739429a-9152-4e3a-b76e-00a7a2893dc2 (last visited Mar. 30, 2025).
[27]   DFPI Findings, *supra* note 25, at 62.

106.   When users request an ExtraCash advance loan through the Dave app, the overdraft service fee is applied automatically and there is no mechanism for obtaining ExtraCash funds without paying this fee.

107.   Although Defendants frame the new 5% fee as somehow associated with an "overdraft service," in reality, it is merely a cost of credit. Defendants offered a materially identical credit product for years without charging an "overdraft service fee" and only began charging one after its fee practices were challenged by the FTC and DOJ. What's more, labeling the transactions "overdrafts" does not change the fundamental nature of the transaction: that Defendants provide users with short-term, high-cost cash advances. *See infra*.

108.   When properly viewing Dave's expedite fees, subscription fees, tips, and other service fees as costs of credit (*i.e.* finance charges), the annual percentage rates (APR) for these loans are eye-popping.

109.   A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:



**Total cost of using earned wage access products is close to that of payday loans**

The average APR for earned wage access advances is over 330%, according to 2021 data on transactions across five companies. Of the 5.8 million transactions completed by tip-based companies, 73% included tips.

*Annual Percentage Rates (APRs) help compare the total cost of borrowing money, including interest and fees:*

New car loans
7%

Credit card plans
21%

**Wage-based cash advances that don't request tips**
331%

**Wage-based cash advances that request tips**
334%

Payday loans
353%

Chart: Erica Yee, CalMatters • Source: national average APRs for new car loans and credit card accounts with finance charges (2023 Q1) from the Federal Reserve; state average APRs for earned wage access products and payday loans (2021) from the CA Dept. of Financial Protection & Innovation • Get the data • Created with Datawrapper

110.   The APR received by Dave for its cash advance product is similar and can be ***much higher***. An analysis of thousands of Dave loan transactions found the

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

average APR paid for Dave ExtraCash loans to be 329%.[28] As discussed *infra*, Dave made loans to Plaintiffs with APRs dramatically exceeding the applicable MLA and PLA usury limits, with one such loan costing **1,288% APR**. *See infra*.

111.   Ironically, Dave and other industry participants market their products as a low-cost alternative to payday loans.[29] In truth, Dave is a wolf in sheep's clothing: extending loans with APRs nearly identical to the exorbitantly-priced payday loan products it claims to replace.

112.   On top of charging loan-shark interest rates, Dave and others limit the amount a borrower can access per day, while simultaneously allowing multiple advances per pay period, thereby fostering repeat withdrawals and concomitant repeated payment of expedite fees and tips.

113.   Dave, specifically, allows qualifying users to take up to two advances per pay period—an initial advance, and a second "Advance Recharge" which may be available within one day of an initial advance. Financially insecure borrowers often take out serial loans, in part because Dave's conservative limits on the amount of funds users can obtain in any given ExtraCash advance through strict underwriting practices.

114.   This architecture maximizes fees for EWA providers like Dave, while creating a debt trap for vulnerable consumers. "By imposing limitations on how much can be borrowed in a single advance, while allowing more than one advance per pay period, lenders force borrowers to take out multiple advances—and pay multiple fees—to access more money. The business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee or leaving a tip difficult to avoid."[30]

---

[28] *Not Free*, *supra* note 22, at 10.

[29] *Dave Inc. 2024 Form 10-K*, at p. 18 (noting Dave "compete[s] against companies and financial institutions . . . serving credit-challenged consumers, including . . . payday lenders").

[30] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, Ctr. for Responsible Lending, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").

115.   The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

116.   A Center for Responsible Lending ("CRL") analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[31] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

117.   Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[32]

**EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect**

118.   While EWA products are financially disastrous for customers, EWA products have proven profitable for the companies offering them. They maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

119.   As discussed above, "Not all members [who sign up for a Dave account and pay subscription fees] qualify for ExtraCash and few qualify for $500."

---

[31] *Loan Shark*, *supra* note 31, at 7.
[32] *Not Free*, *supra* note 21, at 6.

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

120.    To be eligible for an ExtraCash advance, borrowers must meet minimum qualifications set by Dave.

121.    ExtraCash loans are available only to U.S. citizens or lawful permanent residents who are "at least 18 years of age, have a U.S. physical address or military addresses[,] and have a Social Security Number or Tax Identification Number." According to Dave's terms of service, ExtraCash advances are "only available to individuals for personal, family or household purposes" and may not be used by a business or for a business purpose.

122.    In addition, to obtain an ExtraCash loan, users must provide demographic information about themselves (including *inter alia* name, date of birth, email, phone number, and social security number) to Dave, connect a bank account to the Dave app, sign up to pay monthly subscription fees, and pre-authorize Dave to assess fees and collect repayment of borrowed funds.

123.    Moreover, a borrower can only qualify if their connected bank account has a positive balance and includes three or more recurring deposits, totaling $1,000 or more.

124.    To determine whether a borrower is creditworthy, and decide how much credit to extend in the first place, Dave requires users to connect their accounts to the Dave app through a third-party service called Plaid.[33] Plaid partners with Dave and other fintech companies to allow them to view data in customers' accounts. Plaid allows Dave to "[q]uickly verify assets and income" of Dave users, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[34]

---

[33] Users signing up for a Dave account through the app are shown a screen directing the user to connect their bank account to Dave and are unable to access ExtraCash advances unless they connect their bank account through Plaid.
[34] *Plaid Solutions: Credit*, PLAID.COM, https://plaid.com/solutions/credit/ (last visited Mar. 23, 2025).

125.   Dave uses its real-time insight into customer accounts to ensure borrowers will have sufficient funds to repay their loans on payday and schedule debits for the payday immediately following any given loan, ensuring their loans are paid as soon as funds become available. The settlement (or repayment) date is automatically scheduled "to be around your next payday, or the nearest Friday, to make sure you have funds available."

126.   Dave's underwriting process is detailed and considers many factors. Dave continually adjusts maximum withdrawal amounts depending on the individual's borrowing history and financial health (as gleaned through Plaid). In determining how much credit to extend, Dave considers "a wide variety of data points," including:

- Bank account balance history
- Spending patterns
- Income history
- Other risk-based factors.[35]

127.   Dave also considers borrowers' "prior history with [Dave] and the activity in your connected account. Settling your prior ExtraCash transfers on time and in full, maintaining a positive and having recurring deposits in your linked bank account can be positive factors."[36]

128.   According to Dave's 2024 Annual Report, once a borrower "connects his or her bank account to the Dave app, data regarding the Member's account is gathered and analyzed. The amount of the advance available to a Member is a function of a proprietary machine-learning-based algorithm that analyzes historical

---

[35] *ExtraCash FAQs: What affects my eligibility for an advance?*, DAVE APP (last visited Mar. 30, 2025).
[36] *ExtraCash^TM eligibility*, DAVE, https://support.dave.com/hc/en-us/articles/34766110141709-ExtraCash-eligibility (last visited Mar. 30, 2025).

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

spending, savings and earnings patterns based on data gathered from the Member's bank account, among other data points."[37]

129.    Dave further notes that its ability to consistently collect on money loaned to borrowers is essential to its business model: "The performance of ExtraCash is significantly dependent on our ability to develop and deploy effective models, with oversight by our bank partner, to evaluate an applicant's credit profile and likelihood of default based on a variety of factors and originate ExtraCash overdrafts."[38]

130.    Dave's underwriting process is both rigorous and continuous. Dave advises it updates user eligibility "daily" and encourages users to "check back tomorrow to see if [the amount available] increased."[39]

131.    Qualifying for a cash advance from Dave is by no means guaranteed. According to an investigation by the Federal Trade Commission, more than 75% of the time, Dave does not offer users an ExtraCash loan at all and, on average, 40% of users are not able to obtain a single offer for a cash advance from Dave in a calendar month.[40]

132.    That is, after reviewing borrowers' financials, Dave determines many of its customers (who pay monthly subscription fees to potentially obtain cash advances) are not credit worthy and declines to offer them ExtraCash loan access.

133.    For borrowers who qualify, Dave strictly monitors their financial health to determine whether they are eligible and, if so, how much credit to extend based on borrowers' default risk and ability to repay.[41] Through its constant

---

[37] *Dave Inc. 2024 Annual Report*, at 8.
[38] *Id.* at 20.
[39] *ExtraCash^{TM} eligibility*, DAVE, https://support.dave.com/hc/en-us/articles/34766110141709-ExtraCash-eligibility (last visited Mar. 30, 2025).
[40] DOJ Compl., ¶ 35.
[41] *ExtraCash^{TM} eligibility*, DAVE, https://support.dave.com/hc/en-us/articles/34766110141709-ExtraCash-eligibility (last visited Mar. 30, 2025) ("The ExtraCash you are eligible for updates daily and each day, the limit may change."); *Dave Inc. 2024 Form 10-K*, at 20 (noting the

underwriting process, Dave extends loans to borrowers only when it is confident they will repay.

134.    For qualifying borrowers, Dave generally begins by offering relatively low amounts of credit: The most common loan offer is $25.

135.    Borrowers obtain greater access to credit—*i.e.*, Dave raises their maximum loan limit—by consistently paying off loans to Dave on time and generally improving their financial health (which Dave monitors through the borrowers' bank balance, spending behavior, repayment history, and income).

136.    Dave notably restricts access to its largest loans to a select few of its borrowers. For new users, only about 1 in 10,000 (or 0.009%) of users are offered a $500 loan amount. And more than 99% of loan offers were for less than $250.

137.    These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[42] The only distinction—that traditional lenders review credit scores and reports and borrowers' applications to determine creditworthiness while Dave directly reviews borrowers' financial accounts—is one without a difference.

138.    Dave's requirement that users link a checking account (that receives a consistent source of directly deposited income) to their Dave profile and provide a

---

financial performance of Dave's ExtraCash product "is significantly dependent" on Dave's ability to "evaluate an applicant's credit profile and likelihood of default").

[42] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, FED. RESERVE BANK OF BOSTON (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, ARMED FORCES BANK (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

debit card enables a fulsome underwriting process (see *supra*) and ensures seamless repayment (see *infra*).

139.   Users who sign up for ExtraCash loans from Dave must authorize Dave to automatically withdraw, from their connected bank account or debit card, outstanding ExtraCash advances, including any Express Fees, overdraft service fees, and (for most of the relevant period) tips. Dave automatically schedules repayment to be made around the borrower's next payday, or the nearest Friday, to ensure funds are available.

140.   When a connected account has insufficient funds to cover repayment, Dave is authorized to charge the user's connected debit card associated with their account. Borrowers must further agree that if that payment method fails, Dave may process the repayment through an ACH transfer. If both of those methods fail, Dave is authorized to attempt to recoup funds from other affiliated settlement accounts or "Dave Checking Account/Dave Spending Account." If all of those methods fail, Dave is authorized to make additional collection attempts on the next date it detects (from its constantly-updated Plaid data) sufficient funds in any of the borrower's accounts to repay the debt.

141.   In sum, Dave's underwriting process requires, before any money changes hands, that borrowers: (1) provide detailed demographic information, including addresses and social security numbers, to Dave, (2) demonstrate they receive regular, consistent income, (3) in an amount sufficient to cover existing obligations *and* an ExtraCash Advance; (4) link the bank account to which direct deposits are received to Dave's app through Plaid; (5) authorize Dave to automatically debit the linked accounts on the borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees; and (6) be current on all prior ExtraCash advance loans. Borrowers who fail to complete these steps cannot obtain cash advances.

142.   If a customer is unable to repay a loan, Dave prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid. In addition, Dave prohibits users from cancelling their automated monthly subscription fees until all ExtraCash loans are repaid.

143.   Moreover, Dave discloses in its annual report that it "may use professional external debt collection agents to collect delinquent ExtraCash advances."[43]

144.   Through these underwriting procedures and policies, Dave ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's next payday is deposited.

145.   These debt collection methods are so successful that EWA lenders recoup their advances at least 97% of the time using these tactics.[44]

146.   Dave discloses similar success in securing repayment in its annual reports. For instance, Dave touted the fruits of its strict underwriting and debt-collection practices in a table showing the "average 28-day delinquency rate" of ExtraCash loans with rates that are consistently low and falling:[45]

| Year | Average 28-Day Delinquency Rate |
|------|---------------------------------|
| 2020 | 4.34% |
| 2021 | 3.93% |
| 2022 | 3.65% |
| 2023 | 2.51% |

---

[43] *Dave, Inc. 2024 Form 10-K*, at 12.

[44] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, FIN. HEALTH NETWORK (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

[45] *Dave, Inc. 2024 Form 10-K*, at 8. The "28-day delinquency rate for a particular month represents the total delinquent principal disbursed in that calendar month (inclusive of the delinquent pledged instant transfer fees and tips) divided by the total receivables created in that particular calendar month." *Dave, Inc. 2023 Form 10-K*, at 8, https://investors.dave.com/static-files/c65136cf-5c00-4baa-b0cb-3b42ab862294 (last visited Mar. 30, 2025).

147.   In regulatory filings, Dave characterizes outstanding ExtraCash loans as "ExtraCash Receivables" which "represent outstanding originations, tips, and processing fees, net of direct origination costs, less an allowance for credit losses."[46]

148.   A chart reflecting ExtraCash Receivables from Dave's 2024 annual report is reproduced below:

**Note 5 ExtraCash Receivables, Net**

ExtraCash receivables, net, represent outstanding originations, tips, and processing fees, net of direct origination costs, less an allowance for credit losses.

Below is a detail of ExtraCash receivables, net as of December 31, 2024 (in thousands):

| Days From Origination | Gross ExtraCash Receivables | Allowance for Credit Losses | ExtraCash Receivables, Net |
|---|---|---|---|
| 1-10 | $ 142,623 | $ (2,112) | $ 140,511 |
| 11-30 | 36,198 | (6,223) | 29,975 |
| 31-60 | 7,882 | (4,937) | 2,945 |
| 61-90 | 6,140 | (4,712) | 1,428 |
| 91-120 | 5,717 | (4,719) | 998 |
| **Total** | **$ 198,560** | **$ (22,703)** | **$ 175,857** |

149.   Dave represents that its "credit losses for the year ended December 31, 2024 was *lower* compared [to] the year ended December 31, 2023, due primarily to improved collections performance throughout the year[.]" Likewise, the "decrease in amounts written-off for [2024 compared to 2023] were also primarily as [sic] result of improved collections performance year over year despite higher ExtraCash originations, which increased to $5.1 billion from $3.6 billion year over year."

150.   As these figures and statements show, consumers are obligated to pay—and Dave expects to receive and is adept at collecting—ExtraCash funds loaned by Dave.

**The "Overdraft" Structure of the Transactions is a Mask for Evident Short-Term Consumer Credit Transactions**

151.   Defendants deploy a peculiar structure for ExtraCash transactions in a transparent bid to sidestep laws and regulations applicable to consumer credit and

---

[46] An allowance for credit losses is a contra-asset account that represents an estimate of the expected credit losses on financial assets, like loans, that a company holds. It's essentially a reserve to cover potential losses from borrowers defaulting on their debts.

lending. Specifically, Defendants claim "Dave's ExtraCash product is structured as a bank-originated overdraft . . . ." Defendants maintain "ExtraCash and our optional fees sit within the overdraft regulatory framework that is distinguished from EWA and paycheck advance products."[47]

152.  Characterizing ExtraCash as an "overdraft" service is fundamentally incompatible with the substance of the cash advance transactions.

153.  An overdraft service is a banking feature that allows customers to make payments or withdrawals from a checking account even when their account balance is insufficient, essentially borrowing money from the bank to cover the shortfall. The service generally involves a fee and is limited to a preset maximum amount.[48]

154.  ExtraCash accounts are not designed to hold money—and in fact they may never hold a penny. As noted above, the sole function for which ExtraCash accounts are advertised to, and used by, consumers is as a vehicle for short-term cash advances.

155.  Dave advertises (on its website and elsewhere) "advances," not deposit accounts with overdraft protection.

156.  Likewise, Dave directs users to "Select advance amount," which is nonsensical in the context of a genuine overdraft transaction.

157.  Dave offers short-term cash advances, with screens to users showing: "You're approved." People are not "approved" in advance for specific overdraft transactions.

---

[47] Press Release: *Dave Issues Statement Regarding CFPB Proposal*, DAVE, (July 18, 2024), https://investors.dave.com/news-releases/news-release-details/dave-issues-statement-regarding-cfpb-proposal.
[48] *What is overdraft protection?*, OFFICE OF THE COMPTROLLER OF THE CURRENCY (Apr. 2021), available at https://www.helpwithmybank.gov/help-topics/bank-accounts/nsf-fees-overdraft-protection/overdraft-protection-programs/overdraft-protection.html#:~:text=Overdraft%20protection%20is%20an%20agreement,legal%20opinion%20of%20the%20OCC.

158.    "Overdrafts" are described in Dave's terms as "Advances." Likewise,
users are given an "Advance Limit," which is "clearly communicated to you via the
Mobile App" when a transfer is requested.

159.    Further, the concept of express fees in an overdraft situation is bizarre
and illogical. Bona fide overdrafts are approved (or not) instantly to cover a pending
transaction, and there is no possibility of delivering funds on a faster or slower
schedule.

160.    The realities of Defendants' ExtraCash account—including how it is
operated and used—illustrate it is nothing more than a disguised loan.

161.    How an "overdraft" happens in the context of an ExtraCash account is
unclear. First, Dave tells consumers through the app it has agreed to make an
advance and the borrower is "approved":



162.    Then, the borrower selects how much of an advance they want and

how fast, agrees to the express fee, and agrees the advance will be automatically repaid from their linked account.

163.    Next, the borrower selects "transfer cash," which moves the funds from Defendants to the borrower's linked bank account.[49] According to Dave, this transfer triggers a negative balance that Dave considers to be the overdraft.

164.    Before the overdraft occurs, Dave agrees to pay the "overdraft" (by approving the transaction) and the borrower agrees to repay the overdraft plus associated fees and charges (*i.e.*, the "overdraft service fee" and express fee).

165.    Indeed, for substantially all of Dave's customers, *every* ExtraCash advance results in an overdraft in a hefty fee, and users' account balances are always either negative (if an advance is outstanding) or $0.00 (if one isn't).

166.    Though Dave claims ExtraCash deposit accounts can hold "a maximum balance of up to $500," they need not contain any balance at all. Consumers who actually want to hold deposits through Dave get a separate "Dave Checking Account."

167.    ExtraCash accounts do not appear to come with any debit card, checks, bill pay, or other mechanism to spend money that might trigger an overdraft.

168.    For each "overdraft," the parties agree in a contract (memorialized in written electronic form by Defendants) that Defendants will pay the "overcharge" and impose a 5% "overdraft fee" which the borrower agrees to repay.

169.    Separately, Defendants' disparate treatment of overdrafts in the various accounts they offer demonstrate the "simplified overdraft service fee" is not a bona fide service fee, but instead a disguised finance charge.

170.    That is, "overdrafts" on ExtraCash demand deposit accounts (which

---

[49] *Extra Cash Advances*, DAVE, https://web.archive.org/web/20240822192415/https://dave.com/extra-cash-advances (archived from Aug. 22, 2024)("I'm approved for an ExtraCash™ advance. Now what? Choose how much of the advance you want to take, up to your approved amount. Then choose how you want to transfer it: instantly to your Dave Checking account (this costs a small fee) or within an hour to another debit card (this costs a small fee too)").

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

include a credit feature) result in a 5% overdraft fee. Conversely, Defendants offer demand deposit accounts, branded "Dave Checking Accounts," and state in the terms and conditions for such accounts that "we do not charge you insufficient funds fees or overdraft fees."

### Defendants' History of Payday Lending Further Shows its Supposed "Overdraft" Service Product is a Disguised Loan

171.   That Dave's "Overdraft" service is disguised lending is further supported by Dave's longstanding history of payday lending through different "structures."

172.   Dave has been in the payday lending business since 2015. Before adopting the overdraft model, Dave had a "legacy" lending program that was functionally the same, but mechanically different.

173.   In its 2021 annual report, Dave described its cash advance product as a "non-recourse cash advance product." *See Dave Inc.2021 Form 10-K*, at p. 21, available at https://investors.dave.com/static-files/82d58a6d-524c-4c16-b9f7-9b7b2f2f9682.

174.   In a prior lawsuit where Dave was sued for predatory lending practices with respect to its legacy cash advance product, Dave's authorized representative (Chief Financial Officer) characterized the prior ExtraCash iteration as a "now-discontinued non-recourse cash advance service."[50]

175.   The non-recourse model has been used by Dave and other EWA providers in a bid to avoid regulation applicable to consumer credit and lending. These companies have argued, with mixed results, that a non-recourse cash advance does not give rise to "debt," which is a necessary predicate for a finding that a financial product is consumer credit and therefore regulated by TILA, the MLA, and state usury caps. *See, e.g.*, 32 C.F.R. § 232.3(h); 15 U.S.C. § 1602(f); *Orubo v.*

---

[50] *Franklin v. Dave Inc.*, No. 1:24-cv-00687-ADC, ECF No. 39-4, ¶ 5 (D. Md. Oct. 29, 2024).

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

*Activehours, Inc.*, No. 5:24-cv-04702-PCP, 2025 WL 1257695 (N.D. Cal. Apr. 30, 2025); *Golubiewski v. Avtivehours, Inc.*, No. 3:22-CV-02078, 2024 WL 4204272 (M.D. Pa. Sept. 16, 2024).

176.   Notably, Dave's legacy "non-recourse cash product" was called ExtraCash, the same name as Dave's current "overdraft" service. *E.g.*, *Dave Inc. 2021 Form 10-K*, at p. 4, 8 ("ExtraCash is our 0% APR advance product that gives Members access to much-needed liquidity to avoid overdraft fees or bridge themselves to their next paycheck.").

177.   When the legacy "non-recourse" product was in place, there were no references to *Dave charging* "overdrafts" in connection with the cash advance product. Instead, at the time, Dave boasted that its cash advance product helped members "avoid punitive overdraft fees and access short-term liquidity." *Dave Inc. 2021 Form 10-K*, at p. 4.

178.   In 2022, Dave modified how it describes the mechanics of ExtraCash—now as an "ExtraCash overdraft advance product offered through Evolve" instead of a non-recourse cash advance product. *Dave Inc. 2022 Form 10-K*, at 14, available at https://investors.dave.com/static-files/26e2fc51-3b9e-432b-9b70-37b7e44cadac.

179.   Despite the change in nomenclature, ExtraCash has functioned in a materially identical way both before and after the transition from ExtraCash as a "non-recourse" product to its current "overdraft service" form. Dave's legacy ExtraCash product allowed users to access "cash advances" and users notionally "had the option to expedite delivery of a Legacy Advance for a disclosed fee and to leave a voluntary tip in appreciation of Dave's [] Legacy Advances."[51] That is precisely how Dave's current ExtraCash product works.

180.   The only material difference between the legacy ExtraCash product

---

[51] *Franklin v. Dave Inc.*, No. 1:24-cv-00687-ADC, ECF No. 39-1, at p. 8 (D. Md. Oct. 29, 2024).

and current version is that Dave replaced its tipping model with a "simplified" 5% overdraft fee—but, notably the change in fee structure happened years *after* ExtraCash was supposedly transitioned to an overdraft service.

## **Defendants' Loans to Plaintiffs**

181.    Plaintiff, Spc. Russell was an active-duty Specialist stationed at Fort Hood in central Texas. He was an active duty servicemember from August 2021 until January 2025.

182.    Plaintiff PFC Preston is currently a Private First Class in the U.S. Army stationed at Fort Bragg in North Carolina. He has been active duty since July 2023 and his contract with the U.S. Army continues through July 2027.

183.    Plaintiff SSG Tosches is currently a Staff Sergeant in the U.S. Army stationed at Fort Stewart in Georgia. He has been active duty since July 2014 and his contract with the U.S. Army continues through July 2034.

184.    Defendants extended consumer credit to Plaintiffs in the form of ExtraCash advance transactions like those discussed above.

185.    Plaintiffs each used the loans from Dave for personal, family, or household purposes.

186.    Plaintiffs paid Dave's finance charges, in the form of Express Fees, subscription fees, tips, and overdraft service fees, to obtain cash-advance loans from Dave.

187.    A small selection of ExtraCash loans made by Defendants to Plaintiff Spc. Russell are shown in the below table, with the cost of credit and APR included:[52]

| Date | Principal Amt. | Express Fee / Tip / Total | Loan Period | APR |
|------|----------------|---------------------------|-------------|-----|

---

[52] These calculations are demonstrative—as well as the calculations below for Plaintiffs Preston and Tosches—and do not include, for instance, the subscription fees which must be included in the military APR calculation pursuant to 32 C.F.R. § 232.4(c)(1)(iii)(C).

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

| 3/4/24 – 3/13/24 | $125.00 | $6.25 / $6.25 / $12.50 | 9 days | 406% |
| 8/8/24 – 8/13/24 | $225.00 | $11.25/$11.25/$22.50 | 5 days | 730% |
| 8/20/24 – 8/28/24 | $100.00 | $5.00 / $5.00 / $10.00 | 8 days | 456% |

188.   A small selection of ExtraCash loans made by Defendants to Plaintiff PFC Preston are shown in the below table, with the cost of credit and APR included:

| Date | Principal Amt. | Overdraft Fee / Express Fee / Total | Loan Period | APR |
|---|---|---|---|---|
| 1/4/25 – 1/8/25 | $60.00 | $5.00 / $0.90 / $5.90 | 4 days | 897% |
| 1/6/24 – 1/8/24 | $90.00 | $5.00 / $1.35 / $6.35 | 2 days | 1,288% |
| 2/20/25 – 2/27/25 | $60.00 | $5.00 / $0.90 / $5.90 | 7 days | 513% |

189.   A small selection of ExtraCash loans made by Defendants to Plaintiff SSG Tosches are shown in the below table, with the cost of credit and APR included:

| Date | Principal Amt. | Overdraft Fee / Express Fee / Total | Loan Period | APR |
|---|---|---|---|---|
| 2/10/25–2/12/25 | $115.00 | $5.75 / $1.72 / $7.47 | 2 days | 1,185% |
| 2/13/25–2/26/25 | $50.00 | $5.00 / $0.00 / $5.00 | 13 days | 281% |
| 6/3/25–6/10/25 | $95.00 | $5.00 / $1.42 / $6.42 | 7 days | 352% |

190.   Plaintiffs each received many usurious loans from Defendants since they started using the service.

---

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

191.   The fees attendant to the loans (including, *inter alia*, Express Fees, subscription charges, tips, and overdraft fees) are immediately and directly connected to Defendants' extensions of credit to Plaintiffs.

## **CLASS ACTION ALLEGATIONS**

192.   Plaintiffs bring this class action on behalf of themselves and all other persons similarly situated and the general public. The proposed "MLA Class" and the "TILA Class" (collectively the "Classes") are defined as follows:

**MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with Defendants to use their ExtraCash (or substantially similar) product, in which Defendants were paid a finance charge (including, without limitation, an express fee, subscription charge, tip, or overdraft fee).

**TILA Class**: All Covered Members, dependents of Covered Members, and Georgia residents in the United States that entered into an agreement with Defendants to use their ExtraCash (or substantially similar) product, in which Defendants were paid a finance charge (including, without limitation, an express fee, subscription charge, tip, or overdraft fee).

**Georgia Class**: All Georgia residents that entered into an agreement with Defendants to use their ExtraCash (or substantially similar) product, in which Defendants were paid a finance charge (including, without limitation, an express fee, subscription charge, tip, or overdraft fee).

193.   Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) Dave and any entity in which Dave has a controlling interest, or which has a controlling interest in Dave, and its legal representatives, assigns and successors; (c) Evolve and any entity in which Dave has a controlling interest, or which has a controlling interest in Dave, and its legal representatives, assigns and successors; and (d) all persons who properly execute and file a timely request for exclusion from the Classes.

194.   Plaintiffs reserve the right to amend the Class definitions if further

investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

### Numerosity and Ascertainability

195.   Plaintiffs are unable to state the precise number of members of the classes because such information is in the exclusive control of Defendants. Defendants' scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable. Defendants have made millions of loans, and Plaintiffs estimate there are, at least many thousands of consumers in the MLA Class, TILA Class, and Georgia Class. As a result, Plaintiffs believe that the total Classes each number in (at least) the thousands, thus members of the Classes are so numerous that joinder of all class members is impracticable. The exact size of the proposed classes, and the identity of the members thereof, will be readily ascertainable from the business records of Defendants.

196.   The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Defendants' possession, custody, or control.

### Commonality

197.   There are common questions of law and fact affecting the rights of each Class member and common relief by way of damages. The harm that Defendants have caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

- Whether Plaintiffs and the MLA Class members are Covered Members subject to the protections and limitations of the MLA;
- Whether Dave is a "creditor" subject to the protections and limitations of the MLA;

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

- Whether Evolve is a "creditor" subject to the protections and limitations of the MLA;

- Whether Defendants' loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

- Whether Defendants made loans (as that term is understood under O.C.G.A. § 16-17-2) to SSG Tosches and the Georgia Class;

- Whether Defendants entered into standard form loan agreements with Covered Members;

- Whether Defendants' loans exceed the MLA statutory rate cap of 36% MAPR;

- Whether Defendants' loans exceed the Georgia statutory usury cap;

- Whether Defendants failed to provide required credit disclosures in violation of the MLA and TILA;

- Whether Defendants' used a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation in violation of the MLA;

- Whether Defendants' standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

- Whether Defendants' standard form loan agreements contain an arbitration clause in violation of the MLA;

- Whether each month Defendants charged interest to Plaintiffs and Class Members it restarted the statute of limitations under the MLA;

- Whether each month that Plaintiffs and the Class Members paid money to Defendants it restarted the statute of limitations under the MLA;

- Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

- Whether Defendants should be enjoined from continuing their lending practices in the manner challenged herein;

- Whether Defendants are subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Plaintiffs and the Classes are entitled under 10 U.S.C. § 987(f)(5); and

- Any declaratory and/or injunctive relief to which the Classes are entitled.

### **Typicality**

198.   The claims and defenses of Plaintiffs are typical of the claims and defenses of the MLA Class because Plaintiffs are Covered Members and loan agreements with Defendants are typical of the type of personal, household, or family loans that Defendants normally provide to Covered Members. Additionally, Defendants use the same or substantially similar standard form loan agreement in all of their lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. For similar reasons, the claims and defenses of Plaintiffs are typical of the claims and defenses of the TILA Class and SSG Tosches's claims are typical of the claims and defenses of the Georgia Class. Plaintiffs suffered damages of the same type and in the same manner as the Classes they seek to represent. There is nothing peculiar about Plaintiffs' claims. Plaintiffs have no interests antagonistic to the interests of the other members of the Classes.

### **Adequate Representation**

199.   Plaintiffs will fairly and adequately assert and protect the interests of the Classes. Plaintiffs have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Plaintiffs have no conflict of interest that will interfere with maintenance of this class action.

200.   Plaintiffs and their counsel are committed to vigorously prosecuting

the action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

### **Predominance and Superiority**

201.    The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual litigation:

- The Classes are so numerous as to make joinder impracticable. However, the Classes are not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Defendant when confronted with incompatible standards of conduct;

- Adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and

- The claims of the individual Class members are small in relation to the expenses of individual litigation, making a Class action the only procedural method of redress in which Class members can, as a practical matter, recover.

202.    The proposed Classes fulfill the certification criteria of Fed. R. Civ. P. 23.

### **FIRST CAUSE OF ACTION**
### **(Violations of the Miliary Lending Act, 10 U.S.C. § 987, *et seq.*)**
### **(On Behalf of Plaintiffs and the MLA Class against Defendant Dave)**

203.    Plaintiffs re-allege and incorporate by reference herein the allegations

set forth in the paragraphs 1–202 above.

204.    The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

205.    A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

206.    "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4.

207.    Plaintiffs and the MLA Class Members are "Covered Members," subject to the protections and limitations imposed by the MLA. A Covered Member is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

208.    Plaintiffs are considered a "Covered Member" with respect to their loan agreements with Dave because when they received the loans in question, Plaintiffs were active duty service members, obligated to repay loans taken out for personal, family or household purposes.

209.    Dave is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Members protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

210.    The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for

personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

211.    Dave charged Plaintiffs and the MLA Class well above the 36% interest rate cap on their loans, in violation of the MLA.

212.    Dave fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

213.    Dave's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

214.    Dave's standard form loan agreements include class action waivers trial waivers in violation of 10 U.S.C. § 987(e)(2).

215.    Dave's standard form loan agreements entail Dave using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation, in violation of 10 U.S.C. § 987(e)(5).

216.    As a result, Dave violates 10 U.S.C. § 987.

217.    Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class, Plaintiffs seek an order from the Court awarding statutory damages against Dave in the amount of $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. § 987(f)(5)(A).

218.    Plaintiffs are entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

WHEREFORE, Plaintiffs pray for relief as set forth below.

**SECOND CAUSE OF ACTION**
**(Violations of the Miliary Lending Act, 10 U.S.C. § 987, *et seq*.)**
**(On Behalf of Plaintiffs and the MLA Class against Defendant Evolve)**

219.    Plaintiffs re-allege and incorporate by reference herein the allegations set forth in the paragraphs 1–202 and 204–208 above.

220.    Evolve is a "creditor" subject to the requirements and limitations

imposed by the MLA in that it engages in the business of extending consumer credit to Covered Members protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

221.    The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

222.    Evolve charged Plaintiffs and the MLA Class well above the 36% interest rate cap on their loans, in violation of the MLA.

223.    Evolve fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

224.    Evolve's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

225.    Evolve's standard form loan agreements include class action waivers trial waivers in violation of 10 U.S.C. § 987(e)(2).

226.    Evolve's standard form loan agreements entail Dave using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation, in violation of 10 U.S.C. § 987(e)(5).

227.    As a result, Evolve violates 10 U.S.C. § 987.

228.    Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class, Plaintiffs seek an order from the Court awarding statutory damages against Evolve in the amount of $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. § 987(f)(5)(A).

229.    Plaintiffs are entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CAUSE OF ACTION
**(Violations of the Truth In Lending Act, 15 U.S.C. § 1601, *et seq.*)**
**(On Behalf of Plaintiffs and the TILA Class against Defendant Dave)**

230.   Plaintiffs re-allege and incorporate by reference herein the allegations set forth in the paragraphs 1–202 above.

231.   TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. Dave's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

232.   Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

233.   Dave is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

234.   Dave has not provided such disclosures before consummation of the loan agreements.

235.   Dave failed to provide such disclosures to Plaintiffs and the TILA Class.

236.   As a result, Dave violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

237.   Accordingly, pursuant to 15 U.S.C. § 1640, on behalf of the TILA Class, Plaintiffs seek an order from the Court awarding actual damages and statutory damages and attorneys' fees and costs against Dave.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FOURTH CAUSE OF ACTION
### (Violations of the Truth In Lending Act, 15 U.S.C. § 1601, *et seq.*)
### (On Behalf of Plaintiffs and the TILA Class against Defendant Evolve)

238.   Plaintiffs re-allege and incorporate by reference herein the allegations set forth in the paragraphs 1–202 and 231–232 above.

239.   Evolve is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

240.   Evolve has not provided such disclosures before consummation of the loan agreements.

241.   Evolve failed to provide such disclosures to Plaintiffs and the TILA Class.

242.   As a result, Evolve violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

243.   Accordingly, pursuant to 15 U.S.C. § 1640, on behalf of the TILA Class, Plaintiffs seek an order from the Court awarding actual damages and statutory damages and attorneys' fees and costs against Evolve.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FIFTH CAUSE OF ACTION
### (Violations of the Georgia Payday Loan Act)
### (On Behalf of Plaintiff Tosches and the Georgia Class against Defendant Dave)

244.   Plaintiff Tosches re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–202 above.

245.   Plaintiff Tosches brings this claim individually and on behalf of the Georgia Class.

246.   Dave is engaged in the business of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less. O.C.G.A. § 16-17-2(a), (b).

247.   Dave is not a bank or credit union and is not licensed under any Georgia law to engage in that business.

248.   Dave does not meet any of the statutory exceptions to the general prohibition against the making of loans of $3,000.00 or less. See O.C.G.A. § 16-17-2(a)(1)-(4).

249.   Plaintiff Tosches and the Georgia Class are borrowers residing in Georgia who obtained cash-advance loans from Dave and paid interest and other charges in connection with those loans.

250.   Dave advanced funds to Plaintiff Tosches to be repaid at a later date.

251.   Dave's conduct described herein violated and continues to violate the PLA, which means that the loans of Plaintiff Tosches and the Georgia Class were void ab initio, that Dave is barred from collecting any amounts on those loans, and that Defendant is additionally liable to Plaintiff Tosches and the members of the Georgia Class for three times the amount of any interest or other charges, and attorneys' fees and costs. *See* O.C.G.A. § 16-17-3.

252.   Accordingly, Plaintiff Tosches, individually and on behalf of the Georgia Class, requests: (i) payment of all principal of any loans repaid in the last 20 years; (ii) payment of triple the amount of any tips, fees, or other amounts repaid in the last 20 years; (iii) a declaration that Plaintiff's and the Georgia Class members' loans are void ab initio; (iv) and an order prohibiting Defendant from attempting to debit Plaintiff Tosches's or the Georgia Class members' bank accounts to repay any cash advances.

### SIXTH CAUSE OF ACTION
#### (Violations of the Georgia Payday Loan Act)
#### (On Behalf of Plaintiff Tosches and the Georgia Class against Defendant Evolve)

253.   Plaintiff Tosches re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–202 above.

254.   Plaintiff Tosches brings this claim individually and on behalf of the Georgia Class.

255.   Evolve is engaged in the business of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less. O.C.G.A. § 16-17-2(a), (b).

256.   Evolve is not licensed under any Georgia law to engage in consumer lending in Georgia.

257.   Evolve does not meet any of the statutory exceptions to the general prohibition against the making of loans of $3,000.00 or less. See O.C.G.A. § 16-17-2(a)(1)-(4).

258.   Plaintiff Tosches and the Georgia Class are borrowers residing in Georgia who obtained cash-advance loans from Evolve and paid interest and other charges in connection with those loans.

259.   Evolve advanced funds to Plaintiff Tosches to be repaid at a later date.

260.   Evolve's conduct described herein violated and continues to violate the PLA, which means that the loans of Plaintiff Tosches and the Georgia Class were void ab initio, that Evolve is barred from collecting any amounts on those loans, and that Defendant is additionally liable to Plaintiff Tosches and the members of the Georgia Class for three times the amount of any interest or other charges, and attorneys' fees and costs. *See* O.C.G.A. § 16-17-3.

261.   Accordingly, Plaintiff Tosches, individually and on behalf of the Georgia Class, requests: (i) payment of all principal of any loans repaid in the last 20 years; (ii) payment of triple the amount of any tips, fees, or other amounts repaid in the last 20 years; (iii) a declaration that Plaintiff's and the Georgia Class members' loans are void ab initio; (iv) and an order prohibiting Defendant from attempting to debit Plaintiff Tosches's or the Georgia Class members' bank accounts to repay any cash advances.

## **PRAYER FOR RELIEF**

WHEREFORE, on behalf of the Classes, Plaintiffs pray for judgment against Dave, Inc., and Evolve Bank & Trust as follows:

a. That the Court determine that this action may be litigated as a class action and that Plaintiffs and their counsel be appointed class representative and class counsel, respectively;

b. That the Court enter judgment against Dave and Evolve and in favor of Plaintiffs and the Classes on all counts;

c. That the Court find and declare that that Plaintiffs and MLA Class Members' standard form loan agreements violate the MLA;

d. That the Court find and declare that Defendants violated the MLA and award Plaintiffs and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

e. That the Court award Plaintiffs and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

f. That the Court find and declare that Defendants violated TILA and award Plaintiffs and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

g. An order awarding the members of the Classes actual, statutory, treble, and all other damages available by law, with pre- and post-judgment interest;

h. That the Court enjoin Defendants from continuing to engage in predatory lending practices in violation of the MLA, TILA, and PLA;

i. That Defendants be required by this Court's Order to compensate Plaintiffs' counsel for their attorneys' fees and costs of suit, and that Defendants be ordered to bear the cost of notice to the absent class members, as well as the administration of any common fund;

j. That the Court award interest as allowable by law;

k. That the Court award reasonable attorneys' fees as provided by applicable law, including under the MLA, the TILA, and PLA;

l. That the Court award all costs of suit; and

m. That the Court award such other and further relief as the Court may deem just and proper.

Dated:  July 2, 2025                          Respectfully submitted,


                                             */s/ Lee Lowther*
                                             Hank Bates (SBN 167688)
                                             hbates@cbplaw.com
                                             Randall K. Pulliam (*pro hac vice*
                                             forthcoming)
                                             rpulliam@cbplaw.com
                                             Lee Lowther (*pro hac vice*)
                                             llowther@cbplaw.com
                                             Courtney Ross Brown (*pro hac vice*)
                                             cbrown@cbplaw.com
                                             **CARNEY BATES & PULLIAM, PLLC**
                                             One Allied Drive, Suite 1400
                                             Little Rock, AR 72202
                                             Telephone: (501) 312-8500
                                             Facsimile: (501) 312-8505

                                             Gillian L. Wade (SBN 229124)
                                             gwade@waykayslay.com
                                             Sara D. Avila (SBN 263213)
                                             sara@waykayslay.com
                                             Collins Kilgore (SBN 295084)
                                             ckilgore@waykayslay.com
                                             **WADE KILPELA SLADE, LLC**
                                             2450 Colorado Avenue, Ste. 100E
                                             Santa Monica, California 90404
                                             Telephone: (310) 667-7273
                                             Facsimile: (424) 276-0473

                                             Joshua Jacobson (*pro hac vice*)
                                             joshua@jacobsonphillips.com
                                             **JACOBSON PHILLIPS, PLLC**
                                             2277 Lee Road, Suite B
                                             Winter Park, FL 32789
                                             Telephone: (321) 447-6461

                                             *Attorneys for Plaintiffs Michael Russell,*
                                             *Joseph Preston, James Tosches and the*
                                             *Proposed Classes*

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

1                                        **<u>DEMAND FOR JURY TRIAL</u>**

2             Plaintiffs hereby demand a trial by jury of each and every cause of action so

3 triable.

4 Dated:  July 2, 2025                 Respectfully submitted,

5

6                                     */s/ Lee Lowther*

7                                     Hank Bates (SBN 167688)
hbates@cbplaw.com
Randall K. Pulliam (*pro hac vice*

8 forthcoming)
rpulliam@cbplaw.com
Lee Lowther (*pro hac vice*)

9 llowther@cbplaw.com
Courtney Ross Brown (*pro hac vice*)

10 cbrown@cbplaw.com
**CARNEY BATES & PULLIAM, PLLC**

11 One Allied Drive, Suite 1400
Little Rock, AR 72202

12 Telephone: (501) 312-8500
Facsimile: (501) 312-8505

13

14 Gillian L. Wade (SBN 229124)
gwade@waykayslay.com

15 Sara D. Avila (SBN 263213)
sara@waykayslay.com

16 Collins Kilgore (SBN 295084)
ckilgore@waykayslay.com

17 **WADE KILPELA SLADE, LLC**
2450 Colorado Avenue, Ste. 100E

18 Santa Monica, California 90404
Telephone: (310) 667-7273

19 Facsimile: (424) 276-0473

20 Joshua Jacobson (*pro hac vice*)
joshua@jacobsonphillips.com

21 **JACOBSON PHILLIPS, PLLC**
2277 Lee Road, Suite B

22 Winter Park, FL 32789
Telephone: (321) 447-6461

23

24 *Attorneys for Plaintiffs Michael Russell,*
*Joseph Preston, James Tosches and the*

25 *Proposed Classes*

26

27

28

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND